In re WESTERN WORLD FUNDING, INC.,

In re LEASCO FINANCIAL CORPORATION,

In re UNITED SECURITY SYSTEMS, INC.,

In re UNITED EMERGENCY SERVICES, INC.,

In re UNITED SECURITY SYSTEMS LEASING, INC., Debtor.

Timothy J. HENDERSON, Trustee, Plaintiff,

v.

Neil BUCHANAN, Clair Vogt, Bruno Menicucci, Anna Menicucci, Air Priority Airways, Hartford Trust Company, World Resorts, Inc., and Menicucci Insurance Services, Inc., Defendants.

Bankruptcy Nos. 82–477, 82–508, 82–517, 82–507 and 82–478.
Adv. No. 82–214.

United States Bankruptcy Court, D. Nevada.

Sept. 5, 1985.

Lee S. Molof, Henderson & Nelson, Reno, Nev., for plaintiff.

Frank R. Petersen, Petersen & Petersen, Reno, Nev., for defendants Bruno and Anna Menicucci.

Cal F. Hoover, Reno, Nev., for defendants Clair Vogt and Neil Buchanan.

## MEMORANDUM DECISION

ROBERT CLIVE JONES, Bankruptcy Judge.

Western World Funding, Inc. filed its petition under Chapter 11 of the Bankruptcy Code on June 16, 1982, and was soon joined by the other above-named debtors. The Trustee was appointed by Order dated July 6, 1982, and the Trustee's motion for joint administration was granted on July 8, 1982. Sometime later, on April 5, 1983, these cases were converted to Chapter 7 and substantively consolidated.

In the meantime, the Trustee commenced this adversary proceeding by the filing of a Complaint on August 13, 1982. The Com-

plaint contained thirteen causes of action, including allegations of breach of fiduciary duty, conversion of corporate assets, and preferences. The Trustee also sought a determination that the defendants Buchanan, Menicuccis and Vogt operated the debtor corporations as partnerships, and as their alter egos. After two years of discovery, pre-trial motions, and amendments to the Complaint, this proceeding came on for a trial on the merits during the month of September, 1984. Having duly considered the record, this Court hereby makes its Findings of Fact and Conclusions of Law as required by Bankruptcy Rule 7052. To the extent that the Findings contain Conclusions of Law, they shall be deemed to be Conclusions; to the extent that the Conclusions contain Findings of Fact, they shall be deemed to be Findings.

## FINDINGS OF FACT

The segregation of the following Findings of Fact within headings indicating, generally, the various causes of action, does not necessarily imply that a specific Finding of Fact does not relate to more than one cause of action. Many of the proposed Findings of Fact relate to more than one cause of action, and the headings which follow are merely for convenience.

1. Defendant Bruno Menicucci, with regard to his credibility as a witness, was relatively straight forward and honest with the Court, with the exception that some of his perceptions and responses regarding his responsibility for the actions of Western World Funding, the lack of records of Western World Funding, and the investment of monies in his control were less than sincere. The Court does not believe and finds, contrary to his testimony, that Mr. Menicucci did not think that the investors' funds were going into short-term bank notes, leases, and leasing blocks. He knew, the Court finds, that investors' funds were instead going into United Security Systems Leasing.

2. The Court finds, with regard to the credibility of Defendant Clair Vogt as a witness, that her testimony was not at all credible. The Court finds Mrs. Vogt to be a relatively astute and intelligent person. She was at the offices of the debtors almost every day. She issued checks, maintained bank accounts, and managed apartments. She knew how to handle assets of her own. Consequently, the Court finds incredible her statements that she simply took direction from Defendant Neil Buchanan. The Court also finds incredible her repeated response to questioning that she did not recall. The Court believes, and finds, that she recalled when she wanted to recall.

3. The Court finds, with regard to the credibility of Defendant Neil Buchanan as a witness, that his testimony was almost totally not credible. He had to be corrected out of his own prior deposition testimony more often than any other witness. The Court wondered, at first, after listening to his testimony for an hour or two, whether Mr. Buchanan knew the difference between truth and falsity. The Court has concluded, after listening to his testimony for several days, that he knows, very well, the difference and intended the falsities. The Court observed personal mannerisms of Mr. Buchanan, both facial and hand actions, as well as an aggressive voice and attitude, which he exhibited when he attempted to cover up or state a falsehood.

4. Defendants Neil Buchanan and Clair Vogt were officers and Directors in each of the five debtor entities as well as twenty other related corporations.

5. Defendant Bruno Menicucci was President and Director of debtor Western World Funding, Inc. and President of debtor Leasco Financial Corporation.

6. Defendant Anna Menicucci was Vice-president of debtor Western World Funding, Inc.

7. Defendants Clair Vogt and Neil Buchanan each consented to, approved of, or ratified the other's use of corporate funds, all as discussed more fully below, for personal or improper purposes.

8. The debtor corporations did not consent to, ratify, or approve of the breaches

of fiduciary duty, all as discussed more fully below.

9. The debtor corporations were all insolvent from their inception.

### Partnership

10. Defendants Neil Buchanan and Clair Vogt had an express agreement to operate businesses as co-owners and to share in the profits of these business.

11. Defendants Neil Buchanan and Clair Vogt understood and intended this association to be a partnership.

12. Defendants Neil Buchanan and Clair Vogt, as partners, acted as agents for each other with respect to all transactions discussed herein.

13. This partnership, comprised of Defendants Neil Buchanan and Clair Vogt, organized, incorporated or controlled more than twenty-five (25) corporations in the State of Nevada.

14. Five (5) of these corporations were the above-captioned debtors, Western World Funding, Inc., United Security Systems Leasing, Inc., United Security Systems, Inc., United Emergency Services, Inc., and Leasco Financial Corporation.

15. One aspect of the partnership agreement was that Clair Vogt agreed to loan the necessary monies for start-up costs and also use her credit rating and personal guarantees to borrow additional operating funds.

16. Another aspect of the partnership agreement was that Neil Buchanan would act as the Managing Director for each of the ventures undertaken by the partnership.

17. Neil Buchanan and Clair Vogt, as general partners, did actually receive and share in the gross profits from the various ventures, including the debtor companies.

18. Both Neil Buchanan and Clair Vogt shared in the management responsibilities of the various ventures undertaken by their partnership.

### Alter Ego

19. Defendants Neil Buchanan and Clair Vogt and the partnership of Neil Buchanan and Clair Vogt caused the funds of the debtor entities to be freely transferred and co-mingled with the funds in the accounts of each other and with the funds in the accounts of the other related entities.

20. Defendants Neil Buchanan and Clair Vogt and the partnership of Neil Buchanan and Clair Vogt caused the personal funds of Clair Vogt to be freely transferred and co-mingled with the funds of the five debtor entities and with the funds of the other related entities, as if all these funds were Defendant Clair Vogt's funds and the funds of the partnership.

21. Defendant Neil Buchanan diverted funds of the five debtor entities to noncorporate and personal purposes and treated such debtor company funds as if they were his own.

22. Defendant Neil Buchanan transferred significant amounts of funds belonging to the debtor entities to his daughter, Beverly Buchanan, for her personal expenses, including medical expenses, living expenses, university tuition expenses, dental expenses, and other similar expenses.

23. Defendants Neil Buchanan and Clair Vogt, and the partnership of Neil Buchanan and Clair Vogt, diverted debtor company funds and used such funds for personal gambling purposes, and did gamble with such funds at numerous casinos in the Reno, Nevada area.

24. Defendant Neil Buchanan diverted debtor company funds for the purchase of a gift shop business for Defendant Buchanan's wife in the State of Washington.

25. Defendants Neil Buchanan and Clair Vogt took more than $50,000.00 in cash belonging to the debtor companies to their residences and kept this cash at their homes and used said cash for personal purposes.

26. Defendants Neil Buchanan and Clair Vogt dined out regularly at expensive restaurants, for non-business purposes, and

paid for these meals with debtor company funds.

27. Defendant Neil Buchanan used debtor company funds for personal expenses including purchase of clothing, drycleaning expenses, medical expenses, and other personal expenses.

28. Defendant Clair Vogt diverted funds belonging to all of the debtor entities to her own personal uses, including the payment of personal loans borrowed from First Interstate Bank of Nevada and American Investors Management Mortgage Co., as well as for other personal expenses.

29. Defendant Clair Vogt and the partnership of Clair Vogt and Neil Buchanan held herself and itself out to be personally liable for the debts of the debtor companies, and personally guaranteed loans received from, among others, First Interstate Bank of Nevada, as well as for loans made to debtors Western World Funding, Inc. and United Security Systems Leasing, Inc. from the many investors.

30. Defendant Clair Vogt personally guaranteed payment of a United Security Systems Leasing, Inc. promissory note payable to Richard and Marie Waiton.

31. Defendant Clair Vogt utilized her credit rating and guaranteed payment, on behalf of debtor Leasco Financial Corporation, for the purchase of Silver State Thrift and Loan Co.

32. Defendants Neil Buchanan, Clair Vogt, the partnership of Neil Buchanan and Clair Vogt, and Defendants Bruno and Anna Menicucci failed to maintain minutes of corporate meetings for debtors Western World Funding, Inc. and Leasco Financial Corporation.

33. Defendants Neil Buchanan, Clair Vogt, and the partnership of Neil Buchanan and Clair Vogt failed to maintain minutes of corporate meetings for debtors United Security Systems, Inc., United Emergency Services, Inc. and United Security Systems Leasing, as well as for the other related companies.

34. Defendants Neil Buchanan, Clair Vogt, the partnership of Neil Buchanan and Clair Vogt, and Bruno and Anna Menicucci, failed to hold regular corporate meetings, including directors meetings, officers meetings, or shareholders meetings for debtors Western World Funding, Inc. and Leasco Financial Corporation.

35. Defendants Neil Buchanan, Clair Vogt and the partnership of Neil Buchanan and Clair Vogt, failed to hold regular corporate meetings, including directors meetings, officers meetings, or shareholders meetings for debtors United Security Systems Leasing, United Security Systems, Inc., United Emergency Services, and the other related companies.

36. Defendants Neil Buchanan, Clair Vogt, the partnership of Neil Buchanan and Clair Vogt, and Bruno and Anna Menicucci failed to properly issue stock in debtors Western World Funding, Inc. and Leasco Financial corporation.

37. Defendants Neil Buchanan, Clair Vogt and the partnership of Neil Buchanan and Clair Vogt, failed to properly issue stock in debtors United Security Systems Leasing, United Security Systems, Inc., United Emergency Services and the other related companies.

38. Defendants Neil Buchanan, Clair Vogt, the partnership of Neil Buchanan and Clair Vogt, and Bruno and Anna Menicucci failed to follow or maintain ordinary corporate formalities for debtors Western World Funding, Inc. and Leasco Financial Corporation.

39. Defendants Neil Buchanan, Clair Vogt and the partnership of Neil Buchanan and Clair Vogt, failed to follow or maintain ordinary corporate formalities for debtors United Security Systems Leasing, United Security Systems, Inc., United Emergency Services, Inc. and the other related companies.

40. Defendants Neil Buchanan, Clair Vogt, and the partnership of Neil Buchanan and Clair Vogt were equitable owners in all of the debtor companies.

41. All of the debtor companies, as well as the other related entities, operated from one of three business locations, and by the

time of the filing of the Bankruptcy Petitions for said debtors, all operations for all of the debtors as well as the other entities were headquartered in one business location, that being the offices at 1250 Terminal Way, Reno, NV.

42. All five of the debtor entities, as well as the other related entities, in many cases, used the same employees. Don Base, Virginia Goodnight, Barbara Hoard, Marilyn Kolter, and Vicky Doty were some of the employees that worked for more than one, if not all, of the debtor entities, as well as the other related companies.

43. All of the monies advanced by Clair Vogt to the debtor companies, as well as all the contributions from investors, were intended to be loans, and not capital investments nor were there any contributions which were meant to capitalize any of the debtor companies. Consequently, all five of the debtor entities, as well as the other related entities, were substantially if not completely undercapitalized.

44. Defendants Neil Buchanan, Clair Vogt, the partnership of Neil Buchanan and Clair Vogt, and Bruno and Anna Menicucci disregarded legal formalities and failed to maintain arms-length relationships among and between the debtor companies as well as the other related companies.

45. Defendants Neil Buchanan, Clair Vogt, the partnership of Neil Buchanan and Clair Vogt, and Bruno and Anna Menicucci, freely transferred millions of dollars among and between the debtor entities as well as the other related entities without keeping any intercompany records of such transactions.

46. Defendants Neil Buchanan, Clair Vogt, the partnership of Neil Buchanan and Clair Vogt, and Bruno and Anna Menicucci, caused goods and equipment belonging to one or more of the debtor entities to be leased or used by one or more of the other debtor entities without the preparation or execution of any lease agreements or other formal documentation respecting said use of such goods and equipment, and without providing for payment for the use of such goods and equipment.

47. Debtor United Security Systems Leasing, Inc. purchased goods and services for the other debtor entities without any intercompany records being kept to account for such purchases, and without providing for repayment to United Security Systems Leasing, Inc.

48. Funds from one or more of the debtor companies would be used to pay for personal obligations of Defendants Neil Buchanan, Clair Vogt, and the partnership of Neil Buchanan and Clair Vogt, without any formal records being kept for such payments, and without provisions for repayment.

49. Defendants Neil Buchanan, Clair Vogt, the partnership of Neil Buchanan and Clair Vogt, and Bruno and Anna Menicucci caused debtor Leasco Financial Corporation, on many occasions, to pay the rental payments for debtor Western World Funding, Inc.'s office space in Las Vegas, Nevada, without keeping any formal records for such payments, and without providing for the repayment of these funds to Leasco Financial Corporation.

50. Defendants Neil Buchanan, Clair Vogt, and the partnership of Neil Buchanan and Clair Vogt, used debtor entity funds to procure labor, services, and merchandise for Defendant Neil Buchanan's wife and daughter.

51. Defendants Neil Buchanan, Clair Vogt, the partnership of Neil Buchanan and Clair Vogt, and Bruno and Anna Menicucci caused assets of the debtor entities to be diverted to the other related entities to the detriment of the creditors of the debtor entities.

52. Defendants Neil Buchanan, Clair Vogt, the partnership of Neil Buchanan and Clair Vogt, and Bruno and Anna Menicucci, never completed the business or corporate organization of the five debtor entities.

53. Defendants Neil Buchanan, Clair Vogt, and the partnership of Neil Buchanan and Clair Vogt exercised domination and control over the five debtor companies and

the other related companies; and, defendants Bruno and Anna Menicucci also exercised domination and control over Western World Funding, Inc. and were also equitable owners therein.

54. There existed a unity of interest and ownership between Neil Buchanan, Clair Vogt, the partnership of Neil Buchanan and Clair Vogt, with each of the five debtor corporations as well as the other companies.

55. Adherence to the fiction, that Defendants Neil Buchanan, Clair Vogt, and the partnership of Neil Buchanan and Clair Vogt, are distinct and separate entities from each of the debtor and other related companies would, under the circumstances present in this case, sanction a fraud and promote injustice upon hundreds of creditors of these entities.

*Breach Of Fiduciary Duty*

56. Defendants Neil Buchanan, Clair Vogt, and Bruno and Anna Menicucci failed to maintain adequate bookkeeping, accounting, and other necessary records for debtors Western World Funding, Inc. and Leasco Financial Corporation.

57. Defendants Neil Buchanan, Clair Vogt, and Bruno and Anna Menicucci failed to maintain general ledgers, cash disbursement journals, and failed to prepare or have prepared proper financial statements for Western World Funding, Inc. and Leasco Financial Corporation.

58. Defendants Neil Buchanan and Clair Vogt failed to maintain or have maintained general ledgers, cash disbursement journals, other similar bookkeeping records, and failed to prepare or have prepared proper financial statements for United Security Systems Leasing, Inc., United Security Systems, Inc. and United Emergency Services, Inc. and the other nondebtor related entities.

59. Defendants Neil Buchanan and Clair Vogt failed to prepare or have prepared proper inventory records for United Security Systems Leasing, Inc., United Se-

curity Systems, Inc. and the other debtor companies and the other related entities.

60. Defendants Neil Buchanan and Clair Vogt failed to establish an appropriate record keeping system for the numerous United Security Systems Leasing, Inc. leases, such that many leases were misplaced or completely lost, resulting in the over assignment of such leases when used as collateral to secure loans from investors.

61. Defendants Neil Buchanan, Clair Vogt, and Bruno and Anna Menicucci, by failing to maintain proper bookkeeping and accounting records, consequently failed to, and were completely unable to, monitor the financial progress of the debtor companies; and they further failed to prepare appropriate budgets, financial projections, or other projections necessary for companies dealing in such large amounts of money.

62. Defendant Clair Vogt, on numerous occasions during the four year period from 1978 until 1982 signed hundreds of blank checks on debtor company accounts, often not knowing for what purposes such checks were being written.

63. Defendants Bruno and Anna Menicucci caused over three and one-half million dollars invested in Western World Funding, Inc. (minus 5% retained for expenses) to be transferred directly to United Security Systems Leasing, Inc. This was accomplished by Bruno Menicucci signing checks daily on Western World Funding, Inc. checking accounts in which said investments were deposited, by making said checks payable to United Security Systems Leasing, Inc. and delivering said checks to Neil Buchanan or Clair Vogt.

64. Defendants Bruno and Anna Menicucci caused these transfers to occur without knowing where said funds were to be invested, and without adequate assurances regarding the safety of said funds.

65. Defendants Bruno and Anna Menicucci were told by Defendant Neil Buchanan that if he told them where the monies were being invested, they would not need Mr. Buchanan; and, after being told this, they failed to inquire further or to demand

to know where said monies were being invested.

66. Defendants Bruno and Anna Menicucci continually failed to make appropriate inquiry into what purposes and uses the investors' monies were going to or for.

67. Defendants Bruno and Anna Menicucci transferred these investors funds to United Security Systems Leasing, Inc. without asking to see financial statements or any other financial information regarding United Security Systems Leasing, Inc.

68. If Defendants Bruno and Anna Menicucci had adequately inquired and investigated the financial affairs of United Security Systems Leasing, Inc., they would have discovered that United Security Systems Leasing, Inc. was insolvent during the entire period that Western World Funding, Inc. was operating and transferring investor funds to United Security Systems Leasing, Inc.

69. If Defendants Bruno and Anna Menicucci had appropriately inquired and investigated as to where the investor monies being transferred to United Security Systems Leasing, Inc. were being invested, they would have discovered that these monies were being transferred to several other related companies, including debtors United Emergency Services, Inc., United Security Systems, Inc. and Leasco Financial Corporation, all of which were insolvent during the entire period of time that said funds were being transferred to United Security Systems Leasing, Inc. by these Defendants; and would have discovered many of the conversions of debtor company funds, as discussed herein, by Defendants Clair Vogt and Neil Buchanan.

70. Defendant Bruno Menciucci represented to prospective investors in Western World Funding, Inc. that he knew where their funds would be invested and that their investments would be safe.

71. Defendants Neil Buchanan and Clair Vogt failed to file tax returns for any of the debtor companies in any of the four years preceding the filing of the Bankruptcy Petitions for debtor companies.

72. Defendants Neil Buchanan and Clair Vogt failed to acquire the necessary contractor's license for the operations of United Security Systems Leasing, Inc. and United Security Systems, Inc.

73. Due to Defendants Neil Buchanan and Clair Vogt's failure to keep accurate and proper payroll records for the debtor entities, the Internal Revenue Service was forced to levy against bank accounts of said debtor companies in an amount in excess of $25,000.00.

74. Defendants Bruno and Anna Menicucci failed to cause a tax return to be prepared for Western World Funding, Inc. and further failed to inquire as to whether one was being prepared or when one would be prepared.

75. In a Matter before the Nevada State Contractors Board, in the Matter of United Emergency Services, it was found by the Board that United Emergency Services (1) willfully and deliberately failed to pay money due for materials or services rendered in its connection with its operation as a contractor, (2) that it failed to establish financial responsibility, and (3) that it willfully and deliberately disregarded and violated labor laws.

76. Defendant Neil Buchanan, with Defendant Clair Vogt's knowledge and approval, gambled on numerous occasions with debtor United Security Systems Leasing, Inc. monies.

77. Defendants Neil Buchanan and Clair Vogt induced investors to loan money to the debtor companies knowing that these companies were not making a profit.

78. Defendants Neil Buchanan and Clair Vogt failed to establish any job cost systems in preparing bids for the installation of security equipment by debtors United Security Systems, Inc. and United Security Systems Leasing, Inc.

79. The few bookkeeping records maintained by the debtor companies were, in most cases, inaccurately kept by incompetent employees who were hired and supervised by Defendants Neil Buchanan and Clair Vogt.

80. Defendants Neil Buchanan and Clair Vogt caused the banking accounts of United Security Systems leasing and the other debtor companies to incure extremely high overdraft charges.

81. Defendants Neil Buchanan and Clair Vogt failed to establish any internal controls regarding purchases for the debtor companies such as purchase order systems or voucher systems.

82. Defendants Neil Buchanan and Clair Vogt caused what few company records there were to be intermingled and disorganized.

83. Defendants Neil Buchanan and Clair Vogt kept large sums of debtor company cash funds at their place of residence without accounting for the use of these monies.

84. Defendants Neil Buchanan and Clair Vogt caused the debtor companies to purchase and lease, with all the incumbent expenses, motor vehicles in numbers far in excess of the debtor companies' needs.

85. Defendants Neil Buchanan and Clair Vogt caused the debtor companies to operate with far more personnel than necessary, thus incurring unnecessary expenses.

86. Interest payments made to investors in Western World Funding, Inc. and United Security Systems Leasing, Inc. were in some cases incorrectly calculated.

87. Defendants Neil Buchanan and Clair Vogt failed to have payroll tax reports filed on a timely basis.

88. Defendants Neil Buchanan, Clair Vogt, and Bruno and Anna Menicucci failed to maintain sufficient funds in the accounts of Western World Funding, Inc. and United Security Systems Leasing, Inc. as well as the other debtor entities, to pay outstanding debts to the investors in these entities.

89. Defendants Bruno and Anna Menicucci transferred funds invested in Western World Funding, Inc. to United Security Systems Leasing, Inc. without any security whatsoever.

90. Had Defendants Neil Buchanan, Clair Vogt and Bruno and Anna Menicucci maintained the appropriate accounting records, and from those records prepared financial statements, it would have been apparent that the companies were operating at a substantial loss with a need for immediate changes in the operations.

91. The debtor companies could not have survived without the constant influx of new investors' monies. Defendant Neil Buchanan stated that the developmental phase for the debtor companies was to last eight or nine years before a positive cash flow would be realized; however, the primary financing for these debtor companies were the loans, from more than 300 investors, which were short term, high-interest loans. Thus, Defendants Neil Buchanan and Clair Vogt were aware of the fact that the only way to repay the investors, as the obligations to them became due, was for the companies to maintain a constant influx of new investor monies.

92. Western World Funding, Inc. took in a total of $3,698,724.00 from loans made by investors. Western World Funding, Inc. retained 5% of that figure, $184,936.20, for expenses. The remaining $3,513,787.80 was directly transferred to United Security Systems Leasing, Inc. A total of $701,925.00 was repaid to investors as return of their loans leaving a total of $2,996,799.00 which remains unpaid to investors in Western World Funding, Inc., as of the time of the filing of the Bankruptcy Petitions, and not counting interest earned on that money.

93. A total of $4,621,653.00 was lent to United Security Systems Leasing, Inc. directly by investors. Of this amount, $1,220,460.00 was repaid, leaving $3,401.193.00 as the outstanding principal amount owing to investors at the time of the filing of the Bankruptcy Petition.

94. Debtors Western World Funding, Inc. and United Security Systems Leasing, Inc., took in, during the life of these companies up to the date the Bankruptcy Petitions were filed, $9,830,183.00 from investor loans and internally generated revenue.

This amount was entirely expended by the time the Bankruptcy Petitions were filed. At the time of the filing of the Petitions, the value of the consolidated assets of the companies was $898,913.00. $1,922,385.00 of the $9,830,183.00, had been expended, prior to the filing of the Petitions, for the repayment of debt. A total of $1,352,417.00, of the $9,830,183.00, represents revenue generated by the companies during their operations prior to the filing of the Bankruptcy Petitions. This all resulted in a net loss of $5,656,468.00 for the debtor companies. This loss was proximately caused by the actions and inactions, as discussed herein, of Defendants Neil Buchanan and Clair Vogt.

95. Western World Funding, Inc. was a principal obligor with United Security Systems, Leasing Inc.—as Bruno and Anna Menicucci, Neil Buchanan, and Clair Vogt intended—and thus liable on the loans made by investors to Western World Funding, Inc. The actions and inactions of Defendants Bruno and Anna Menicucci, all as discussed herein, proximately caused Western World Funding, Inc. to incur the $2,996,799.00 liability on the unpaid loans.

### Section 547 Preferential Transfers—Clair Vogt

96. Defendant Clair Vogt received from the debtor companies funds totalling $493,414.44, (which represents a net amount after a credit for funds advanced) which were transferred to her, on account of antecedent debts, and transferred while the debtor was insolvent, all within one year prior to the filing of the Bankruptcy Petitions, which enabled her to receive a greater amount than she would receive if under an 11 U.S.C. Chapter 7 proceeding. Defendant Clair Vogt was an insider as defined in Bankruptcy Code § 101(25), and was such an insider at the time all of the transfers were made. Defendant Clair Vogt had reasonable cause to believe the debtor was insolvent at the time that each of these transfers occurred.

### Preferences—Bruno And Anna Menicucci/Menicucci Insurance Services, Inc.

97. Defendants Bruno and Anna Menicucci personally received a transfer from the debtor companies totalling $10,398.74. This transfer was for their benefit, and was made on account of an antecedent debt owed by the debtors to Bruno and Anna Menicucci personally. This transfer was made while the debtor was insolvent and within 90 days before the date of the filing of the Bankruptcy Petitions. This transfer enabled Bruno and Anna Menicucci to receive more than they would have received had a Chapter 7 liquidation of the debtors occurred and had they received payment for that antecedent debt under that Chapter 7 liquidation.

98. Defendant Menicucci Insurance Services, Inc. received transfers totalling $30,880.05 from the debtor companies. These transfers were for the benefit of Menicucci Insurance Services, Inc., and on account of an antecedent debt owed by the debtor companies to said Defendant. These transfers were made while the debtor was insolvent and all within 90 days before the date of the filing of the Bankruptcy Petitions. These transfers enabled Menicucci Insurance Services, Inc. to receive more than it would have received had this been a Chapter 7 liquidation and had it received payment on this antecedent debt under that Chapter 7 liquidation.

99. Defendant Menicucci Insurance Services, Inc. also received a transfer of $32,164.40. It received this transfer for its benefit on account of an antecedent debt owed by the debtors to Menicucci Insurance Services, Inc. The transfer was made while the debtors were insolvent, and was made between 90 days and one year before the date of the filing of the Petitions. The transfer enabled Menicucci Insurance Services to receive more than it would have received had this been a Chapter 7 liquidation and had it received payment on that debt under that Chapter 7 liquidation. Menicucci Insurance Services, Inc. is wholly owned and controlled by Defendants Bruno and Anna Menicucci. Bruno and

Anna Menicucci are insiders as defined in Bankruptcy Code § 101(25), in the debtor companies making said transfer; and as such insiders, they had reasonable cause to believe that these debtors were insolvent at the time of this transfer. Subsequently, Defendant Menicucci Insurance Services, Inc. made an investment of $50,000.00.

100. None of the transfers by said debtors to either Bruno and Anna Menicucci or Menicucci Insurance Services, Inc. were intended to be contemporaneous exchanges, nor were they in fact substantially contemporaneous exchanges.

101. Said transfers to Defendants Bruno and Anna Menicucci and Menicucci Insurance Services, Inc. were not made in the ordinary course of business or financial affairs of both the debtors and Bruno and Anna Menicucci or Menicucci Insurance Services, Inc.

102. The liabilities of all of the debtor companies substantially exceeded the assets of these companies during the entire year preceding the filing of the Bankruptcy Petitions for these companies, and, thus, these companies were insolvent, as that term is defined in the Bankruptcy Code, for this entire period.

### Fraudulent Transfer—Clair Vogt

103. The debtor companies transferred to Defendant Clair Vogt within one year before the date of the filing of the Bankruptcy Petition funds belonging to these companies totaling $263,141.65 for which there was absolutely no reasonably equivalent value given in exchange, and these debtors were insolvent, as that term is defined in the Bankruptcy Code, on the dates that these transfers were made.

### Fraudulent Transfer—Neil Buchanan

104. Debtor companies transferred to Defendant Neil Buchanan within one year before the date of the filing of the Bankruptcy Petition funds belonging to debtor companies totaling $42,007.48, for which the debtor companies received less than a reasonably equivalent value in exchange for such transfers. The debtor companies

were insolvent, as that term is defined in the Bankruptcy Code, on the dates that all of these transfers occurred.

### Conversion—Vogt

105. During the time period that the debtor corporations were in operation, Defendant Clair Vogt caused the debtor companies to transfer to her, funds belonging to these companies, in an amount totalling $263,141.65, for which Clair Vogt had no contractual or equitable right. Defendant Clair Vogt exercised control and dominion over these funds in such a manner as to deprive the Plaintiff trustee of his interest therein.

### Conversion—Buchanan

106. During the time that the debtor companies were in operation, Defendant Neil Buchanan caused the debtor companies to transfer to him funds belonging to those companies, totalling $124,601.78. Defendant Neil Buchanan had no contractual or equitable rights to such funds and exercised control and dominion over these amounts in such a manner as to deprive Plaintiff trustee of his interest therein.

### Equitable Subordination—Menicucci Insurance Services, Inc.

107. Defendant Menicucci Insurance Services, Inc. has timely filed a proof of claim against the Bankruptcy Estate in the amount of $20,000.00. Defendants Bruno and Anna Menicucci are the sole shareholders of Menicucci Insurance Services, Inc. and exercise control over Defendant Menicucci Insurance Services, Inc. Based upon all of the other findings of fact herein, Defendants Bruno and Anna Menicucci, as agents of Menicucci Insurance Services, Inc. engaged in inequitable conduct resulting in injury to all the creditors of the debtor companies. Equitable subordination of the claim of Menicucci Insurance Services, Inc. would not be inconsistent with the provisions of the Bankruptcy Reform Act.

### *Equitable Subordination—Clair Vogt—Bruno And Anna Menicucci*

108. If Clair Vogt, and/or Bruno and Anna Menicucci return to the Plaintiff/Trustee the amounts of preferential transfers that they received, as discussed herein, they would then have a claim against the Bankruptcy Estates for that amount. However, based upon all of the other Findings of Fact and Conclusions of Law herein, Defendants Clair Vogt, and Bruno and Anna Menicucci did engage in inequitable conduct which resulted in injury to all of the other creditors of the debtor companies. Equitable subordination of these prospective claims of these Defendants would not be inconsistent with the provisions of the Bankruptcy Reform Act.

## DISCUSSION AND CONCLUSIONS OF LAW

### I. JURISDICTION AND PROCEDURES

The Court has subject matter jurisdiction over this adversary proceeding pursuant to 28 U.S.C. § 157(a), and Special Order Nos. 48 and 50 of the District Court for the District of Nevada.

■ For the first time at the end of a long trial, the defendants objected to the authority conferred on this Court by the Bankruptcy Amendments and Federal Judgeship Act of 1984, P.L. No. 98–353, 98 Stat. 333 (July 10, 1984), § 106 and § 121, which continue the office of sitting bankruptcy judges. This challenge to the validity of the current bankruptcy court system has already been adequately analyzed and rejected by several district courts. *See e.g. In re Benny*, 44 B.R. 581 (D.C.N.D.Cal. 1984); *Danning v. Lummis (In re Tom Carter Enterprises)*, 44 B.R. 605 (C.D.Cal. 1984). This Court is in agreement with the results reached, namely that the challenged provisions of the 1984 Amendments do not effect a Congressional "appointment" of judges in violation of the federal Constitution.

This trial involved both core and non-core "related" matters. Actions to recover preferences and fraudulent conveyances are designated core proceedings by 28 U.S.C. § 157(b)(2)(F) and (H). Equitable subordination directly affects the liquidation of the assets of the estate, and hence is a core proceeding pursuant to § 157(b)(2)(O ). *Bank of New Richmond v. Production Credit Assoc. of River Falls, Wisc. (In re Osborne)*, 42 B.R. 988, 11 C.B.C.2d 1349, 1355 (D.C.W.D.Wis.1984). The breach of duty, alter ego, and partnership actions are related claims. The Court here enters its findings of fact, conclusions of law, and judgment pursuant to 28 U.S.C. § 157(b)(1) and (c)(2), and Bankruptcy Rules 7052 at 7054.[1]

### II. BREACH OF FIDUCIARY DUTY

■ Although not strictly speaking "trustees", officers and directors are fidu-

---

**1.** As under the former "Emergency Rules", this Court routinely enters its orders and judgments in "final" form in "related proceedings", 28 U.S.C. § 157(c), based on the parties' tacit consent, unless consent is expressly withheld near the outset of the proceeding. If consent is not given, proposed findings and conclusions are submitted to the District Court. In the instant case, none of the parties ever formally objected to this Court's entry of judgment on the "related" actions. The Court issued a tentative ruling, at the end of the trial, indicating that it found substantial liability on the part of the defendants, and directed counsel for the trustee to prepare proposed factual findings. It was not until several months thereafter, during an informal meeting with counsel to discuss those findings, that defendants' counsel indicated an intention to seek *de novo* review pursuant to § 157(c)(1). Since it is this Court's practice simply to enter judgment without any advance notice of its ruling, the Court is not submitting its judgment in "proposed" form to the District Court. In addition, since the trustee's claims are substantially interrelated, it is impractical for the Court to enter proposed findings and conclusions as to some defendants on some issues, and a final judgment as to other defendants or for other issues.

Because these bankruptcies were filed in 1982, the substantive changes made to Title 11 of the United States Code by the 1984 amendments do not apply to this adversary proceeding. *See* Pub.L. No. 98–353, Sec. 553(a). Therefore, references to "Code" or "Bankruptcy Code" are to the Bankruptcy Reform Act of 1978, 11 U.S.C. §§ 101 to 151326, prior to the 1984 amendments. "Bankruptcy Act" and "Act" refer to the former federal law, 11 U.S.C. §§ 1 to 1103 (repealed 1979).

ciaries with respect to the corporation and its shareholders. *Western Industries, Inc. v. General Insurance Company,* 91 Nev. 222, 228, 533 P.2d 473 (1975); See Nev.Rev. Stat. § 162.020 ("Fiduciary" includes officers of corporations and agents). See generally *3 Fletcher, Cyclopedia of the Law of Private Corporations* (hereinafter "Fletcher") §§ 838–860 (1975 rev. perm. ed.). When the corporation is insolvent these duties run to creditors. *Id.* § 849 at 202; *Pepper v. Litton,* 308 U.S. 295, 306–307, 60 S.Ct. 238, 245, 84 L.Ed. 281 (1939); *Hux v. Butler,* 339 F.2d 696, 698 (6th Cir.1964); *In re Jersey Materials Co.,* 50 F.Supp. 428, 430 (D.N.J.1943). Fiduciary duties are also imposed on majority shareholders to the extent that they exercise any control over corporate affairs. *Pepper v. Litton,* 308 U.S. at 306, 60 S.Ct. at 245; *Jones v. H.F. Ahmanson & Company,* 1 Cal.3d 93, 81 Cal.Rptr. 592, 599–600, 460 P.2d 464, 471–472 (1969).

■ The fiduciary duty comprises two prongs: a duty of care, and a duty of loyalty. *Norlin Corporation v. Rooney, Pace, Inc.,* 744 F.2d 255, 264 (2nd Cir.1984). While the duty of care requires that the corporate fiduciaries exercise their best care and judgment in the management of the corporation[2], the duty of loyalty derives from the prohibition against self-dealing that inheres in the fiduciary relationship. *Id.* The fiduciary is not to benefit at the expense of the corporation and those interested therein; he may not use his power for his personal advantage to the detriment of the corporation and its creditors, "no matter how meticulous he is to satisfy technical requirements." *Pepper v. Litton, supra,* 308 U.S. at 311, 60 S.Ct. at 247. Although fiduciaries are not strictly forbidden to engage in "interested" transactions with the corporation, such transactions must be "inherently fair" and must "carr[y] the earmarks of an arm's length bargain." *Foster v. Arata,* 74 Nev. 143, 325 P.2d 759, 765 (1958).

■ Obviously, officers and directors must use corporate property only for proper corporate purposes. *Lussier v. Mau-Van Development, Inc.,* 4 Hawaii App. 359, 667 P.2d 804, 814 (1983). The unauthorized withdrawal of funds constitutes the tort of conversion and a breach of fiduciary duty. *Gray v. Sutherland,* 124 Cal.App.2d 280, 268 P.2d 754, 761 (1954). The evidence shows that Buchanan used corporate funds to pay his personal expenses, such as rent, utilities, cleaning, and clothing. Other funds were expended for the use of close family members, such as for his daughter's tuition and dentist bills, payments to his son, and funds used to purchase a gift shop for his wife. Large amounts were used for gambling.[3] The total of the funds thus diverted from proper corporate purposes is $124,601.78. Since Buchanan himself testified that he was not to receive any salary during the relevant time period, these transfers can only be

---

2. It is unclear which particular standard of care the Nevada Supreme Court would apply in this case. In some jurisdictions, corporate fiduciaries must exercise that degree of care which a prudent person would exercise in the conduct of his own affairs. *See e.g. FMA Acceptance Co. v. Leatherby Insurance Co.,* 594 P.2d 1332 (Utah 1979); *McDonnell v. American Leduc Petroleums, Ltd.,* 491 F.2d 380 (2d Cir.1974) (California law). This is the standard applicable to trustees pursuant to Nev.Rev.Stat. § 164.050, which may be imposed on corporate officers and directors, as courts often apply to directors the statutory rules governing trustees in general. *See* 3 *Fletcher* § 840 at 158. Some jurisdictions, such as New York, impose a lower standard of care, requiring only reasonable care under the circumstances. *See Norlin Corp., supra,* at 264. The United States Supreme Court has stated that

"the degree of care required depends upon the subject to which it is to be applied, and each case has to be determined in view of all the circumstances." *Briggs v. Spaulding,* 141 U.S. 132, 147, 11 S.Ct. 924, 929, 35 L.Ed. 662 (1891). *See generally* 3A *Fletcher* § 1030 et seq. The Court would find the defendants liable under any of these standards, taking into account the circumstances, namely that the defendants were handling millions of dollars entrusted by the public to their care.

3. A misappropriation of corporate assets can take the form of speculation with corporate funds. *Hux v. Butler,* 339 F.2d 696, 698 (6th Cir.1964); *Fagerberg v. Phoenix Flour Mills Co.,* 50 Ariz. 227, 71 P.2d 1022 (1937); 3A *Fletcher* § 1106 at 142.

characterized as a misappropriation or conversion of corporate funds. Good faith, even if it were shown, is not a defense to a conversion action. *Lewis v. Devils Lake Rock Crushing Co.*, 274 Or. 293, 545 P.2d 1374 (1976).

■■■ Clair Vogt received over $1 million from the corporations during the time of her involvement. However, the plaintiff is willing to give her a credit for the amount she advanced, thus treating a large number of the transfers as the repayment of loans. The difference—$263,141.65—represents her misappropriation or conversion of corporate funds. Like Buchanan, Vogt was not to receive a salary.

■■■ Vogt and Buchanan are liable for each other's misappropriations. One who knowingly aids or participates in a fiduciary's violation of his trust is also liable for the breach. 76 Am.Jur.2d *Trusts* § 309 at 529 (1975). *See e.g. Hux v. Butler, supra,* at 699–700. Moreover, a corporate fiduciary has an affirmative duty to know the affairs of his corporation and to attempt to prevent the defalcations of his co-fiduciaries. See *DePinto v. Provident Security Life Insurance Co.*, 374 F.2d 37 (9th Cir.1967). An officer or director who participates, ratifies, aids or approves of the breach of duty of a co-fiduciary, or fails to repudiate the wrongdoing, may be jointly liable for the violation. *Preston-Thomas Construction v. Central Leasing Corp.*, 518 P.2d at 1125, 1127 (Okla.App.1974); *Quinn v. Post,* 262 F.Supp. 598 (S.D.N.Y. 1967); *3A Fletcher* § 1114 (1975 rev. perm. ed.). *See generally id.* §§ 1065–1100; Deal, *Liability of Bank Officers,* 39 Bus. Law. 1033 (1984).

The evidence shows that Buchanan, as managing director, had control over the corporations' disbursement of funds. He knew that Vogt took large sums of money from the debtors. He participated with her in the practice of taking significant amounts home in the form of cash, and in transferring sums to Vogt's accounts. He had an understanding with Vogt that corporate funds could be freely transferred to her. He therefore approved of and encouraged her misappropriations. If he did not, he is liable nevertheless for failing to prevent Vogt's misconduct.

The same is true of Vogt. She had actual knowledge of Buchanan's practice of using funds for his personal and family purposes. She had an understanding with him that he could freely transfer funds for his own use. Vogt handed him cash for gambling. She signed the vast majority of checks whereby Buchanan diverted funds for his own and his family's benefit. There was testimony that Vogt presigned blank checks, which is equivalent to handing him cash. This practice itself would constitute culpable negligence, *McDonnell v. American Leduc, supra* note 2, at 385; however, in the context of the parties' understanding and dealing with each other, the Court concludes that Vogt approved of his actions of diverting funds.

The defendants raise several defenses specific to the trustee's conversion cause of action, including the running of the statute of limitations, the failure of the trustee to allege and prove a demand and refusal to turnover the funds, and a right to setoff.

■■■ The trustee added a cause of action for conversion on September 25, 1984, toward the end of trial. Since Buchanan received corporate funds at least as far back as 1978, defendants assert that the three-year statute of limitations for the taking of personal property, Nev.Rev.Stat. 11.190, sub. 3(c), bars the recovery of *any* funds allegedly converted, reasoning that where there is a series of conversions, the statute begins to run from the time of the first conversion. To the contrary, each conversion is a distinct tort, and the statute runs separately from each act. The authority relied on by the defendants stated only that successive conversions of the *same* property does not start the statute running anew. *See Himoff Machine Company, Inc., v. H. & W Motor Sales, Inc.,* 256 F.2d 769 (7th Cir.1958).

■■■ Neither is plaintiff limited to the recovery of funds converted within three years of the date he added the conversion

cause of action. Nev.Rev.Stat. 11.380, a special statute of limitations applicable to actions against directors and stockholders, gives the "aggrieved party" three years to commence an action from the time he learned of the facts constituting the liability. If the "aggrieved party" here is the trustee as representative of the corporation, or the creditors, the cause of action was certainly timely filed, as the trustee was not appointed until 1982, and there is no evidence that the creditors had knowledge of these defalcations until brought to light by the plaintiff. *See e.g. Nettles v. Walcott*, 25 F.Supp. 35 (D.Conn.1938), *aff'd* 107 F.2d 738 (2nd Cir.1939). Even if the corporation must be considered the "aggrieved party," it is a fictional entity and can obtain knowledge only through its agents; yet it is generally held that the knowledge of an agent is not imputed to the corporate principal when the agent acts in a manner adverse to that of the corporation. *First National Bank v. Dean Witter & Co.*, 84 Nev. 303, 307, 440 P.2d 391 (1968); *Edwards v. Carson Water Co.*, 21 Nev. 469, 483–484 (1893); *Kenneally v. First National Bank of Anoka*, 400 F.2d 838, 842 (8th Cir.1968), *cert. denied*, 393 U.S. 1063, 89 S.Ct. 716, 21 L.Ed.2d 706 (1969). The knowledge of co-fiduciaries merely implicates them in the conspiracy if they fail to take action against the active wrongdoer; hence, their knowledge is not imputed to the corporation. *Bailey v. Jacobs*, 325 Pa. 187, 189 A. 320, 328 (1937). Therefore, the corporation could not have learned of the facts constituting the liability until the trustee was appointed.

■ Finally, statutes of limitation are often held to be tolled while the corporation is dominated by the defaulting fiduciaries. Since it can act only through its agents, the corporation is considered to be "incapacitated" while the wrongdoers are in control, as they cannot be expected to institute an action against themselves. 19 Am.Jur.2d *Corporations* § 1334 (1965); *Beal v. Smith*, 46 Cal.App. 271, 189 P. 341, 345 (1920). *Cf. Gascue v. Saralequi Land & Livestock Co., Inc.*, 70 Nev. 83, 88, 255 P.2d 335 (1953). The debtors here were free from the domination of these defendants only when the trustee was appointed. Since the complaint was filed soon thereafter[4], the statute of limitations does not bar the action, and the trustee may recover *all* funds converted.

■ Defendants also argued that the trustee had failed to make, allege, and prove a demand and subsequent refusal by the defendants to turnover the funds allegedly converted. It is often held that a demand and refusal may be necessary to maintain a cause of action for conversion. *See generally* 18 Am.Jur.2d *Conversion* § 63 (1965). However, where the conversion is complete without a demand and refusal, those elements are unnecessary, *Studebaker Bros. Co. v. Witcher*, 44 Nev. 442, 461, 195 Pac. 334 (1921), as in the use of corporate funds for a personal, or other unauthorized, purpose. 18 Am.Jur. *supra*, at 198; *3A Fletcher* § 1109 at 740.

■ Finally, defendants assert a right of setoff against their liabilities for conversion. Buchanan seeks a credit for the reasonable value of his services. There are several reasons for rejecting this. First, considering the harm done to the corporations under Buchanan's management, to be discussed in more detail below, the value of his services is nonexistent or negative. Second, under these circumstances, most courts require the *restoration* of any compensation paid: A corporate fiduciary who engages in activities which constitute serious breaches of duty must return any compensation received for services rendered during that period of

---

4. Moreover, whichever statute applies, the sixteenth cause of action filed in September 1984 relates back to the original complaint filed in August 1982. In the seventh and eighth causes of action of the first complaint, Plaintiff alleged that the defendants had transferred property of the debtors to their personal use. This is an allegation of conversion. *See Gray v. Sutherland*, 268 P.2d at 761. Since only the terminology and relief requested differs from the sixteenth cause of action, the applicable statute was tolled on August 13, 1982. Nev.Rules Civ. Proc. 15(c) *See Deal v. 999 Lakeshore Association*, 94 Nev. 301, 579 P.2d 775, 779 (1978).

time, even though part of those services may have been properly performed. *American Timber & Trading Company v. Niedermeyer*, 276 Or. 1135, 558 P.2d 1211, 1223 (1976). Finally, Nevada courts have not favored a setoff when the corporation is insolvent. Even if the fiduciary has a valid claim against the corporation, his liability is a "trust" for the payment of all creditors, and he must not be allowed to usurp more than his share of the funds by claiming an offset. *Thompson v. Reno Savings Bank*, 19 Nev. 103, 114 (1885). *See also Bayliss v. Rood*, 424 F.2d 142, 147 (4th Cir.1970) (corporate fiduciary should not be allowed setoff against his liability for breach of trust). Setoff is an equitable matter, and in this case, the equities are on the side of the corporation and its creditors.

▬ The same is true of Vogt's claim. She pledged certain parcels of real property as collateral for loans to the corporations and now claims a right to a credit for the value of the property she lost through foreclosure. However, her losses were caused by her own defalcations and those of her agent Buchanan. Therefore, it would be inequitable to decrease the funds available to pay other creditors by allowing this offset.

▬ Buchanan also alleged that he did not convert the funds, but rather had an agreement with the corporations that he would repay the funds advanced when the corporations began making a profit and he received a salary.[5] Even if there had been such an agreement, it would itself constitute a breach of Buchanan's fiduciary duty to the corporations. The debtors were insolvent from their inception.[6] As managing director, Buchanan had a duty to know their financial condition, and is chargeable with that knowledge. *Preston-Thomas Constr., supra,* at 1127; *Atherton v. Anderson,* 99 F.2d 883, 889–890 (6th Cir.1938). He testified that he did not expect the corporations to begin making a profit for eight to ten years. To "borrow" money from the insolvent corporations with a promise to repay a decade later when the corporations became solvent, is a patent abuse of his power and position as a fiduciary. It is obviously unfair to the corporations and their creditors, and cannot be said to have the "earmarks of an arm's length transaction". Therefore, no matter how the court construes this "arrangement", the result is the same: Buchanan's taking the funds constitutes a breach of his duty to the debtors and their creditors. The measure of damages under the "contract" theory is the same as the conversion—the total of the funds received.

▬ The remaining allegations relating to breach of fiduciary duties may be most accurately described as a squandering and waste of corporate assets. The evidence shows that during the life of these companies, the debtors received almost $10 million from outside "investors" and internally generated revenue. Of this, $2 million was used for the repayment of debt, and the debtors accumulated assets of approximately $900,000. Giving a credit for the amount internally generated, $1,352,417, the net loss to the debtors is fixed at approximately $5.6 million. Of this, a total of $387,743.43 was converted by Vogt and Buchanan, and an additional $263,000 is

---

5. In response to this testimony, the trustee added the fifteenth cause of action for breach of the agreement to repay. Buchanan raised several defenses to the trustee's "breach of contract" action. However, it is unnecessary to consider these defenses, since the court construes Buchanan's liability on the alternative "contract" action to be damages to the corporation for the making of the contract, not for breach of the agreement to repay. It is the contract itself, or the taking of funds pursuant to the contract, which constitutes the breach of duty.

6. The evidence shows that the corporations were never capitalized. Operating funds came from loans, both from public "investors" and from Clair Vogt. The funds were quickly dissipated. Vogt was repaid all that she advanced plus a large amount in addition. The investor loans remained liabilities of the corporations at high interest rates, yet no corresponding assets were accumulated. The funds were simply squandered. The continued operations of these corporations only produced more debt; over time, they slipped further and further into insolvency.

literally untraceable. The remainder was ostensibly used for corporate purposes, but given the small amount of internally generated revenue and assets, the Court can only conclude that the bulk of the funds was simply squandered through gross mismanagement and willful neglect. Corporate fiduciaries are liable for the loss or depreciation in the value of the corporation's assets resulting from a breach of duty. *Hudson v. American Founders Life Insurance Co. of Denver,* 151 Colo. 54, 377 P.2d 391, 395 (1962).

The failure to keep adequate records illustrates the defendants' neglect. Buchanan, as managing director, had the ultimate decision-making responsibility. Given the poor state of the corporate records, Buchanan could not have discharged his duty to care for and preserve corporate assets. He could not have made reasonable, informed decisions concerning necessary and proper expenditures, nor could he have recognized and monitored severe problems in the operations and taken remedial action. All of this would have been possible, if he had taken reasonable steps to have corporate records in order, and to consult those records. However, the Court concludes from the evidence that Buchanan was unconcerned with the conditions of the corporations from the viewpoint of their creditors and the public. His actual course of behavior was simply to spend money, apparently without regard for the fact that most of this money represented loans from public "investors".

Clair Vogt is similarly, if not equally, at fault. She was variously described as chairman of the board, chief executive officer, director, and president of all these corporations except Western World Funding. She put Buchanan in the position of managing director, and delegated virtually all management functions to him. However, this does not relieve her of liability, for the failure to supervise is itself a serious breach of duty. The cases are numerous. See *e.g. American Leduc, supra* note 2; *Atherton v. Anderson, supra; Francis v. United Jersey Bank,* 162 N.J.

Super. 355, 392 A.2d 1233 (N.J.Super.1978), *aff'd,* 87 N.J. 15, 432 A.2d 814 (1981); *Ashby v. Peters,* 128 Neb. 338, 258 N.W. 639 (1935); *Lippitt v. Ashly,* 89 Conn. 451, 94 A. 995 (1915); *Gibbons v. Anderson,* 80 F. 345 (C.C.Mich.1897). Moreover, Vogt knew that Buchanan was a gambler, and in fact handed him cash for gambling. It constitutes gross neglect for her to leave Buchanan with control over millions of dollars of "investor" funds, without any supervision, outside audits, or adequate internal accounting procedures or bookkeeping. *See* 3 *Fletcher* § 1076; *Liability of Bank Officers, supra,* at 1037.

The evidence also shows that Vogt participated actively in the squandering of these funds. She knew, as she had a duty to know, of the manner in which the corporations were being operated. Millions of dollars were transferred among the debtors almost without any records being kept. This may have given the false appearance that adequate funds were being generated, but even a cursory look at the checking statements would have revealed severe cash-flow problems, as the debtors incurred substantial fees for insufficient funds checks. Vogt must have known of these problems, because she often advanced funds to meet ordinary operating expenses. She as well as Buchanan must have known that the bulk of the funds also represented liabilities, for they were loans, not contributions to capital stock.

Finally, Vogt held Buchanan out as her personal agent. He acted for her as well as for himself, pursuant to their understanding that they would operate these corporations so as to benefit themselves personally and directly from the funds raised. On this ground alone Vogt is liable for Buchanan's defalcations, as the principal is liable for the acts of the agent.

The Court must separately analyze the liability of Bruno and Anna Menicucci. Their primary responsibility was for Western World Funding (WWF), where Bruno was president and Anna vice-president. WWF was their own company which they brought into association with the other de-

fendants. Its main function was to raise funds from the public. To this end, the Menicuccis allowed their name to be used in various advertisements, knowing that this would inspire confidence in the public, as Bruno was a former mayor of Reno. Once funds came to WWF, they were routinely transferred by Menicucci to United Security Systems Leasing (USSL), and from there to the other corporations, or into the pockets of Vogt and Buchanan.

Menicucci thus transferred funds without adequate assurances that the sole assets of his corporation were being properly managed. Buchanan would not tell him the details of the other operations, or exactly how the funds were being used. It was unreasonable for Menicucci not to demand this information as a condition of his involvement. Buchanan's evasiveness itself was a sign that there were problems, but Menicucci ignored the obvious. A director and officer has a right and a duty to know the affairs of his principal, see discussion *supra;* he cannot ignore what goes on around him, nor excuse himself from liability by urging that he was dominated by others. 3A *Fletcher* § 1060.-1. He must exercise independent judgment. *Great Western Producers Co-operative v. Great Western United Corp.*, 200 Colo. 180, 613 P.2d 873, 878 (1980). In investing or loaning funds he must take proper steps to insure their safety. *Founders Life Corp. v. Hampton*, 597 S.W.2d 897 (Tenn.1980); *Meltzer v. Atlantic Research Corp.*, 330 F.2d 946, 949–950 (4th Cir.) *cert. denied*, 379 U.S. 841, 85 S.Ct. 78, 13 L.Ed.2d 47 (1964). Ordinary caution and prudence requires investigation, and Menicucci was negligent in relying solely on Buchanan's word. *See Gamble v. Brown*, 29 F.2d 366, 379 (4th Cir.) *cert. denied* 279 U.S. 839, 49 S.Ct. 253, 73 L.Ed. 986 (1928).

The Menicuccis virtually ignored their duties. A total of $3,513,787.80 was invested through WWF. Giving the defendants a credit for the 5% retained by the corporation for expenses, and the approximately $700,000 repaid to investors, the net loss to

WWF as well as the investors is $2,997 million.

The defendants raise several defenses to the mismanagement causes of action, including an objection to the plaintiff's theory of causation, and the invocation of the business judgment rule.

The Menicuccis argue that they were mere figureheads, had no real responsibility for the debtors, and thus their actions or inactions could not be the proximate cause of any harm to the corporations. Although the Menicuccis may have had no power over the ultimate disposition of the funds, these defendants were an integral part of WWF's only function vis-a-vis the entire operations, which was to attract "investors" and then funnel the proceeds to the other corporations as well as to Vogt and Buchanan. This was accomplished by the use of the Menicucci name and the holding of the highest offices in Western World Funding by Mr. and Mrs. Menicucci. Moreover, Bruno Menicucci was actively involved in the day-to-day operations; he actually signed the vast majority of checks transferring funds to USSL. Therefore, the Menicuccis were not mere figureheads, but even if they were, their relationship to WWF required that they take responsibility for the operations. *See e.g. Francis v. United Jersey Bank, supra.*

The Menicuccis next argue that they in fact exercised reasonable care. The testimony established that Bruno contacted Clair Vogt's bank and was told that she had assets worth at least $10–13 million, and that the bank perceived no problems with the corporations. Bruno asked Buchanan about the operations of the other corporations, but received no satisfactory answer. However, the Menicuccis did not go far enough to preserve and protect their corporation's assets. The bank's recommendation of Clair Vogt is irrelevant because these loans were to be corporate obligations, not personal obligations of Vogt. The cases cited by the Menicuccis do not help them, for they hold only that a creditor may reasonably rely on a bank's report of his potential debtor's credit sta-

tus. *E.g. Nevada National Bank v. Gold Star Meat Co.,* 89 Nev. 427, 514 P.2d 651 (1973). Vogt's creditworthiness was simply irrelevant here. The Court might come to a different conclusion if Vogt had in fact personally guaranteed these loans, and if the Menicuccis had demanded and received proof of her guaranty. However, the Menicuccis did not request this as a condition of their involvement, and the evidence shows that Vogt personally guaranteed only one note, at the insistence of the investor. The Menicuccis also argue that if Vogt were in fact as wealthy as the bank indicated she was, she would be able to "cover" the entire liability. But this argument again misses the point: The fact that one's potential codefendant might be wealthy enough to pay any judgment does not negate one's own wrongdoing.

Neither can the Menicuccis be absolved by the bank's statement that it perceived no problems in the operations of USSL. As president and vice-president, the Menicuccis had a strict duty to adequately inform themselves; they could not expect a bank to perceive potential problems, nor to understand or be aware of the intricate web of transactions involving all of these debtors. It was unreasonable for the Menicuccis to fail to demand proof of adequate internal accounting procedures and the details of USSL's operations as a condition of their involvement. *See Liability of Bank Officers, supra,* at 1037; 3A *Fletcher* § 1076. The Menicuccis insist that they did demand the information, but that Buchanan was evasive. However, this in itself should have put the Menicuccis on notice that there were problems. If they had exercised reasonable care, they would have looked at USSL's bank statements and cancelled checks, which would have indicated the funds transferred to Buchanan and his family, and further transfers to the other debtors. Therefore, the Menicuccis had the duty and the means to acquire sufficient information which would have clearly illuminated some of the wrongdoing by Buchanan and Vogt.

The Menicuccis' argument that their codefendants were the superseding cause of the damage is also unavailing. Although the Menicuccis may not have been able to change Buchanan's management style, nor influence the disbursement of funds once out of their control, the fact remains that Menicucci could have simply refused to sign any checks in the absence of proper assurances. The malfeasance of others is one of the dangers to be apprehended and guarded against by corporate fiduciaries. *Atherton v. Anderson,* 99 F.2d at 888. Once it is determined that the defendant has a duty to anticipate the intervening misconduct and guard against it, it cannot supersede the defendant's liability. *Prosser & Keeton on Torts* § 44 at 305 (5th ed. 1984). Therefore, the Menicuccis were a substantial factor in causing the damage alleged, and the acts of Buchanan and Vogt were not "superseding causes", but were merely intervening causes of the type that the Menicuccis had the duty and ability to protect against. *See First State Bank of Hudson County v. United States,* 599 F.2d 558, 562 (3rd Cir.1979), *cert. denied* 444 U.S. 1013, 100 S.Ct. 662, 62 L.Ed.2d 642 (1980).

The Menicucci's final argument is that no harm was caused to WWF by their actions, since WWF acted merely as a broker for USSL and therefore has no liability on these notes. There are two ways of viewing the Menicuccis' liability. First, WWF was harmed because it was a principal and not an agent of USSL. With the first check transferring funds to USSL, WWF was rendered insolvent, because it had liabilities but no assets. Even if intended to be an agent, WWF would be liable nonetheless on the theory of the undisclosed or partially undisclosed principal, as the evidence establishes that in many or most instances, investors were not told of the fact that funds were to be transferred to USSL, and the promissory notes indicating some involvement of USSL were often sent later in the mail. See *Peccole v. Fresno Air Service, Inc.,* 86 Nev. 377, 380–381, 469 P.2d 397 (1970); 3 Am.Jur.2d *Agency* §§ 317–320 (1962). The other alternative is

to view the Menicuccis' liability as based simply on their participation in the total squandering of funds; the Court need not think of WWF as a separate corporation with a separate harm in order to find a culpable breach of duty.

The Court reaches a different conclusion, however, as to Leasco. First, it is not established that Anna Menicucci had or was to have any role at all. As for Bruno Menicucci, the plaintiff did not prove that his affirmative actions—principally the negotiation of a few leases—were the cause of any harm. Menicucci signed only three out of the many checks issued on Leasco's accounts. Although an officer or director might be held liable for his nonfeasance as well as misfeasance, *see Quinn v. Post*, 262 F.Supp. at 603, the plaintiff must still bear the burden of proof on causation. It is unclear that Menicucci could have done anything to prevent the harms caused by Vogt and Buchanan. Buchanan did dominate the situation, and as Vogt was the only shareholder and herself implicated in the wrongdoing, informing her for the purpose of a shareholder suit would have been useless. *Compare DePinto*, 374 F.2d at 44. As it is, the Court is satisfied that Vogt knew more than Menicucci did, since she was actively involved in the transfer of funds in and out of Leasco as well as the other debtor corporations. Therefore, as to Leasco, Menicucci was not a substantial factor in causing the harms complained of, and in any event, his codefendants were superseding causes. In some cases, the acts of a dominant director supersede those of a subordinate, inactive director. *See e.g. Newton v. Horn Blower, Inc.*, 224 Kan. 506, 582 P.2d 1136, 1143 (1978).

The defendants contend that they are protected by the business judgment rule, a policy of judicial restraint which allows officers and directors substantial discretion in business operations. *Hearld Co. v. Seawell*, 472 F.2d 1081, 1094 (10th Cir.1972). However, the Rule protects only against liability for honest mistakes of judgment made with due care and in good faith; it does not apply in cases of self-

dealing, *Norlin Corp.*, 744 F.2d at 265, or where a corporate decision lacks a business purpose, "is so egregious as to amount to a no-win situation", or results from "an obvious and prolonged failure to exercise oversight or supervision". *Joy v. North*, 692 F.2d 880, 885–886 (2nd Cir.1982), *cert. denied* 460 U.S. 1051, 103 S.Ct. 1498, 75 L.Ed.2d 930 (1983).

As for the conversion and alternative "contract" causes of action, the Rule is inapplicable because of the "interest" of the defendants in the respective transactions. In such cases, the Rule is superseded by the "inherent fairness" test, which, as discussed above, the defendants have failed to pass. See *Norlin, supra*, at 265. As for the other allegations of mismanagement, the Rule is not a bar to the plaintiff's recovery.

Most of the harm alleged to have been caused by the defendants results from the prolonged failure to exercise informed judgment as well as supervision. Given the poor state of corporate records, the defendants were operating almost totally in the dark; they could not have ascertained the relevant facts before making decisions. The business judgment rule protects only *informed* decisions. See *Whittaker Corp. v. Edgar*, 535 F.Supp. 933, 950 (N.D.Ill.1982); *Casey v. Woodruff*, 49 N.Y. S.2d 625, 643 (1944). The failure to make reasonable efforts to inform oneself may indicate a lack of good faith, but certainly constitutes serious neglect under the circumstances at issue here. Moreover, to the extent that there was evidence of problems, it was ignored. In addition, the overall operations of the debtors, may be described as a "no-win" situation. It was inconceivable that the "investor" loans could be paid out of internally generated funds, given the high interest rates the notes carried, the conversions by defendants, and the further squandering of funds. The Court need not go so far as to conclude that the corporations were mere fronts for an intentionally fraudulent scheme; yet, the effect of the defendants' management and neglect was to produce a pyramid-type

operation, where corporate debts were met only by creating more and deeper debt. Thus, the business judgment rule cannot protect these defendants.

The final defense to all of the breach of duty claims is to invoke the doctrine of ratification. Although they do not dispute the plaintiff's standing *per se* to recover for these breaches,[7] the defendants argue that any defenses which they might have invoked against the corporations may also be raised against the plaintiff trustee, as he stands in the shoes of the debtors. 4 *Collier on Bankruptcy* at 541–63 (15th ed. 1985).

Defendants have not explained to the Court the details of the supposed ratification. They have presented no evidence of express ratification, such as corporate resolutions. But even such direct evidence would not help the defendants. The waste and squandering of corporate assets is *ultra vires* the corporation. *Wheeler v. Home Savings & State Bank*, 188 Ill. 34, 58 N.E. 598, 599 (Ill.App.1900). The Board of Directors, even acting at a duly noticed meeting with full disclosure, has no authority to consent to such acts. *Holland Banking Co. v. Continental National Bank*, 324 Mo. 1, 22 S.W.2d 821, 826 (1929), *cert. denied* 281 U.S. 724, 50 S.Ct. 239, 74 L.Ed. 1142 (1930). Neither can the defendants invoke the doctrine of implied ratification, or ratification by silence. What the Board could not have expressly authorized, it cannot later ratify informally or by silence. *Id.; Bailey v. Jacobs*, 189 A. at 327; 2A *Fletcher* § 770 at 482 (1982 rev. perm. ed.).

The doctrine of implied ratification is most often and most easily invoked in situations where a third party, other than an insider, has conferred a benefit on the corporation by supplying goods or services pursuant to an unauthorized contract; by receiving and retaining the benefits, the corporation is said to ratify the contract and be bound by it. *Carson*

*Water*, 21 Nev. at 489. *See e.g. Citizens Valley Bank v. Mandrones Mining Co.*, 257 Or. 260, 478 P.2d 409, 412 (1970). But the rule is otherwise when it is an insider who attempts to invoke the doctrine against the corporation, particularly as a defense to his liability for breach of duty to his principal. *See e.g. Carson Water, supra*, 21 Nev. at 489–490; *Harris Trust & Savings Bank v. Joanna-Western Mills Co.*, 53 Ill.App.3d 542, 11 Ill.Dec. 78, 368 N.E.2d 629 (1977); *Bailey v. Jacobs, supra*. In such a case, it cannot be maintained that the corporation receives the benefit of the misconduct. See *Wheeler v. Homes Savings, supra*, 58 N.E. at 599. Moreover, ratification requires knowledge of all material facts; as discussed above, the knowledge of its agents is not imputed to the corporation when they act adversely to its interests. The general rule that knowledge of the corporation's business is imputed to the Board and thereby to the corporation is indulged only in favor of innocent third parties, rather than for the benefit of defaulting fiduciaries as against the corporation. *Harris Trust, supra*, 11 Ill.Dec. at 84, at 635. *Cf. Plywood Marketing Associates v. Astoria Plywood Corp.*, 16 Wash. App. 566, 558 P.2d 283, 290 (1976). Further, the actual knowledge and acquiescence of co-fiduciaries who are not active wrongdoers does not lead to corporate ratification, for their knowledge and failure to act only implicates them in the conspiracy. *Bailey v. Jacobs* 189 A. at 328.

Ratification by silence or acquiescence also implies an intent to affirm the unauthorized act, *Shearson Hayden Stone, Inc. v. Leach*, 583 F.2d 367, 369 (7th Cir. 1978); *Breen Air Freight, Ltd. v. Air Cargo, Inc.*, 470 F.2d 767, 773 (2nd Cir.1972), *cert. denied* 411 U.S. 932, 93 S.Ct. 1901, 36 L.Ed.2d 392 (1973), and the ability to disaffirm or repudiate, *Washington National Trust Co. v. W.M. Dary Co.*, 116 Ariz. 171, 568 P.2d 1069, 1073 (1977). However, since the corporation can act only through its

---

7. The estate created pursuant to 11 U.S.C. § 541 succeeds to any right of action a debtor corporation may have to recover damages for misconduct, mismanagement, or neglect of duty by a corporate officer or director. 4 *Collier on Bankruptcy* ¶ 541.10 at 541–67 (15th ed.).

agents, the fact that it is dominated by the wrongdoers adequately accounts for its silence. *Id.* Under the circumstances, the Court cannot infer an intent to ratify.

▮ For similar reasons, the doctrines of waiver and estoppel do not apply. These are both flexible equitable concepts, and can be invoked only by an innocent party, rather than those who would attempt to shield themselves from liability for their misconduct. *Meyers v. Moody,* 693 F.2d 1196, 1208 (5th Cir.1982), *aff'g* 475 F.Supp. 232 (N.D.Tex.1979), *cert. denied,* —— U.S. ——, 104 S.Ct. 287, 78 L.Ed.2d 264 (1983); *Shearson Hayden, supra,* at 370. The defendants may have intended to "ratify" their own wrongful acts, or "waive" the corporations' right to hold them liable, but they are without power to so bind the debtors. Since the right to sue fiduciaries is a corporate asset, *Sutton v. Reagan & Gee,* 405 S.W.2d 828, 835 (Tex.Civ.App. 1966), any attempt to waive the corporation's right to sue, without providing adequate consideration, is a waste of corporate assets and *ultra vires* the corporation. *See Harris Trust v. Joanna,* 368 N.E.2d at 639 (ratification is itself an act of corporate agents which may be challenged as having no rational business purpose, or as being inherently unfair to the corporation).

▮ The defendants' "ratification" argument might be based on Vogt and Buchanan's involvement as shareholders or owners in the acts complained of by the trustee. However, shareholder "ratification" is a completely different matter. While it is in some sense true that shareholders acting unanimously may "ratify" a waste of corporate assets, *American Timber & Trading Co.,* 558 P.2d at 1220; *Michelson v. Duncan,* 407 A.2d 211, 219 (Del. 1979), strictly speaking, this does not amount to *corporate* ratification:

> Ratification by the corporate body ... is to be distinguished from ratification, improperly so-called, by the plaintiff stockholder. The latter does not validate the act complained of and thereby extinguish a cause of action on which the corporation might otherwise have sued, but it

merely deprives plaintiff of his equity to complain.

12B *Fletcher* § 5882 at 328 (1984 rev. perm. ed.). Therefore, where shareholders are active wrongdoers, or approve of and ratify the misconduct of others, their actions merely create an estoppel against them. *Johnson v. King-Richardson Co.,* 36 F.2d 675, 678 (1st Cir.1930); *Swafford v. Berry,* 152 Colo. 493, 382 P.2d 999, 1002 (1963); *Gottlieb v. McKee,* 34 Del.Ch. 537, 107 A.2d 240, 244 (1954).

▮ Ordinarily, the object of suits by the corporation is to benefit shareholders. *Weingand v. Atlantic Savings & Loan,* 1 Cal.3d 806, 83 Cal.Rptr. 650, 464 P.2d 106, 112 (1970). When shareholders are estopped from complaining of the alleged misconduct, a court might also hold the corporation estopped from recovering in its own name. *Bangor Punta Operations, Inc. v. Bangor & Aroostook Railroad Co.,* 417 U.S. 703, 712–714, 94 S.Ct. 2578, 2583–2584, 41 L.Ed.2d 418 (1974); *Atkinson v. Marquart,* 112 Ariz. 304, 541 P.2d 556, 559 (1975). However, this rationale does not apply in the context of the liquidation of an insolvent corporation, for in such a case, it is the creditors who will benefit from any recovery by the corporation. *See e.g. American Timber & Trading,* 558 P.2d at 1221; *Meyers v. Moody,* 693 F.2d at 1207. In some respects it is helpful to think of a debtor as a new entity, and the trustee as its new owner. There is no reason for the Court to impute the estoppel of former owners to the trustee, for his duty under the Bankruptcy Code is to apply the proceeds of any recovery first to the payment of creditors' claims; it is unlikely that after these claims are paid, there will be anything remaining to return to the shareholders. Therefore, even if all the shareholders of the debtors participated in, approved of or in any way ratified the misconduct of the defendants, the trustee is not thereby estopped.

▮ Even if the Court were to find that the doctrine of ratification or estoppel applies to the trustee as representative of the debtors under 11 U.S.C. § 541, the trustee

also has the status of a creditor under § 544(a). Since corporate or shareholder ratification does not apply to creditors who would be prejudiced thereby, such acts do not bind the trustee. *McCandless v. Furland,* 296 U.S. 140, 56 S.Ct. 41, 80 L.Ed. 121 (1935); *Lank v. New York Stock Exchange,* 405 F.Supp. 1031, 1037 (S.D.N.Y. 1975), *rev'd in part on other grounds,* 548 F.2d 61 (2nd Cir.1977); *Field v. Lew,* 184 F.Supp. 23, 27 (E.D.N.Y.1960) *aff'd sub nom. Field v. Bankers Trust Co.,* 296 F.2d 109 (2nd Cir.1961), *cert. denied* 396 U.S. 859, 82 S.Ct. 948, 4 L.Ed.2d 17 (1962); *Neese v. Brown,* 218 Tenn. 686, 405 S.W.2d 577, 583 (1964); *Coddington v. Canaday,* 157 Ind. 243, 61 N.E. 567, 574 (1901); *See* 3 *Fletcher* § 998.[8]

■ Defendants again object, however, arguing that in acting under § 544, the trustee has no greater rights than a creditor under state law, and that nonbankruptcy law does not permit creditors to sue for breach of fiduciary duty. There are many cases holding that a creditor may not maintain an action against corporate fiduciaries for breach of a duty owed primarily to the corporation, where the creditor is harmed only indirectly, and he sustains an injury in common with other creditors. *See e.g. Speer v. Dighton Grain, Inc.,* 229 Kan. 272, 624 P.2d 952 (1981); *Super Valu Stores, Inc. v. First National Bank,* 463 F.Supp. 1183 (M.D.Ga.1979); *McGivern v. Amasa Lumber Co.,* 77 Wis.2d 241, 252 N.W.2d 371 (1977); *Ford Motor Credit Co. v. Minges,* 473 F.2d 918 (4th Cir.1973); *Sutton v. Reagan & Gee, supra.* However, defendants miss the point of these cases,

for they hold only that a creditor may not bring a *personal* action against the fiduciaries, *i.e.,* a single creditor may not bring the action on his own behalf. Such an action leaves the defendants vulnerable to multiple liability, *Super Valu, supra,* at 1196, and allows a single creditor to recover a fund which rightfully belongs to all creditors similarly situated. See *Ficor, Inc. v. McHugh,* 639 P.2d 385, 393 (Colo. 1982). In order to avoid these problems, such actions must be brought in the name of the corporation for the benefit of all persons entitled to participate in the recovery. *Id.; McGivern, supra,* 252 N.W.2d at 378; *Sutton v. Reagan,* 405 S.W.2d at 835.

■ This is exactly the nature of the trustee's action. In his capacity as a creditor under § 544(a), he may bring a "creditors' bill" to reach choses in action belonging to his debtor.[9] When the defense of ratification is raised, he may invoke the "trust fund" doctrine, *i.e.,* since creditors are also beneficiaries of the fiduciary duty when the corporation is insolvent, or its insolvency is imminent, the consent or ratification of cobeneficiaries does not bind those who did not consent. *See* 76 Am. Jur.2d Trusts § 336. *Compare Gray v. Sutherland,* 268 P.2d at 759–761 *with Brainard v. DeLa Montanya,* 18 Cal.2d 502, 116 P.2d 66, 70 (1941). Pursuant to the trust fund doctrine, creditors have a right to complain of misconduct by corporate fiduciaries which either further impairs the assets of an already insolvent corporation, or which causes the insolvency, regardless of the consent of shareholders or the corporation. *See e.g. Realty*

---

**8.** Defendants cite *Cunningham v. Jaffe,* 251 F.Supp. 143 (D.S.C.1966) for the proposition that corporate ratification estops the trustee. However, that court addressed itself only to the trustee's standing as representative of the debtor, and failed to consider the trustee's powers in his creditor capacity. *See id.* at 148–149.

**9.** A creditor's bill is an equitable proceeding brought by a creditor to enforce payment of a debt out of property or interests of his debtor which cannot be reached by ordinary legal process. *Mayea v. Land Conservation & Development Comm.,* 293 Or. 372, 647 P.2d 920, 928 (1982). *See generally* 21 Am.Jur.2d *Creditors'*

*Bills* §§ 1–93 (1981). A creditor may reach a chose in action of his corporate debtor, *Rucks-Brandt Const. Corp. v. Silver,* 194 Okl. 324, 151 P.2d 399, 402 (1944) (statutory), including the liability of officers and directors for diversion of assets, mismanagement, or negligence. 10 *Fletcher* § 4823. In most cases, a creditor must have a judgment and an execution returned unsatisfied in order to maintain a creditor's suit in equity. 21 Am.Jur., *supra,* § 21. *See Stock Growers Bank v. Milisich,* 48 Nev. 373, 233 P. 41 (1925). This is precisely the status of the trustee under 11 U.S.C. § 544(a)(2).

*Exchange Corp. v. Cadillac Land & Development Co.*, 13 Ariz.App. 232, 475 P.2d 522, 525 (1970); *Sweeny v. Happy Valley, Inc.*, 18 Utah 2d.113, 417 P.2d 126, 129 (1966); *Barr & Creelman Mill & Plumbing Supply Co. v. Zoller*, 109 F.2d 924, 927 (2nd Cir.1940). Since these debtors were insolvent from their inception, see note 6, *supra*, all of the acts complained of by the trustee are properly brought in his creditor capacity.[10]

Furthermore, although § 544(a) gives the trustee the legal status of a creditor in his own right, obviously he does not bring the action for his personal benefit. Since he is the representative of the estate, 11 U.S.C. § 323(a), any recovery will be held for distribution *pro rata* to creditors. Neither is there any possibility of double or multiple liability. The trustee has a dual status as representative of the debtors under § 541, and as a creditor under § 544, but he receives only one judgment for the harm caused to the corporations. In addition, once the trustee has decided to sue, no one else has standing to do so: The very cases cited by defendants leave open the possibility of a shareholders' or creditors' suit, if, but only if, the trustee refuses to sue. See *Ford Motor Credit*, 473 F.2d at 921. *See also Underwood v. Stafford*, 270 N.C. 700, 155 S.E.2d 211, 213 (1967).

Therefore, the only difference between the trustee's acting pursuant to § 541 as compared to § 544 is the possible effect of the corporations' or shareholders' consent. Even if the corporations would have been barred from bringing these actions in a nonbankruptcy context, and this bar is imputed to the trustee under § 541, such consent or ratification may be avoided by the trustee acting as a creditor under § 544(a). Law and logic clearly support the proposition that not only is the trustee an appropriate person to bring these actions, but he is the only proper person to do so. *See e.g. American National Bank of Austin v. MortgageAmerica Corp.*, 714 F.2d 1266 (5th Cir.1983).[11]

■ Finally, defendants may not invoke the doctrine that the trustee has no standing to bring "personal" creditor actions. See *e.g. Caplin v. Marine Midland Grace Trust Co. of New York*, 406 U.S. 416, 92 S.Ct. 1678, 32 L.Ed.2d 195 (1971); *Cissell v. American Home Assurance Co.*, 521 F.2d 790 (6th Cir.1975), *cert. denied*, 423 U.S. 1074, 96 S.Ct. 857, 47 L.Ed.2d 83 (1976). The distinction between personal creditor claims against corporate officers and claims which creditors may assert on behalf of the corporation has been described thus:

> The dividing line is whether the cause of action is one which is purely personal, in which no other claimant or creditor of the corporation has an interest, or whether the cause of action is one in favor of creditors in general, which may be availed by "any" one creditor either suing alone (as it is sometime held he may) or as a representative of all the creditors. In the one case the only liability is to the particular person injured, who may or

---

**10.** The fact that the trustee becomes a creditor subsequent to the misconduct complained of, does not impair his standing, for creditors may complain of past misconduct which impaired the corporation's assets. *Julien J. Studley, Inc. v. Lefrak*, 66 A.D.2d 208, 412 N.Y.S.2d 901, 905, *aff'd* 48 N.Y.2d 954, 425 N.Y.S.2d 65, 401 N.E.2d 187 (1979); *Hemrich v. National Bank of Commerce*, 141 Wash. 483, 251 P. 774, 776–777 (1927). *See* 3 *Fletcher* § 1196 and cases cited therein. Furthermore, the defendants have not proven, by way of an affirmative defense, that the creditors in whose behalf the trustee acts had actual knowledge of the conditions existing in the corporation at the time they gave credit, so as to work an estoppel against them. *Compare Hemrich, supra*, at 777; *REA Express, Inc.*

*v. Travelers Ins. Co.*, 406 F.Supp. 1389, 1395–1396 (D.D.C.1976), *affirmed in part and modified in part*, 554 F.2d 1200 (D.C.Cir.1977), *cert. denied*, 434 U.S. 858, 98 S.Ct. 182, 54 L.Ed.2d 131 (1977).

**11.** The court held that a creditors' suit on the trust fund theory, as well as actions to recover fraudulent conveyances, are rights of action which "belong" to the corporation even though they are usually "asserted" by creditors for their own benefit. Therefore, the automatic stay prevents a creditor of a corporate debtor from pursuing these state law causes of action against the corporate fiduciary. *See especially* pp. 1268–1272, 1276.

may not be a creditor of the corporation, as in the case of an action for deceit, while in the other case the liability is to all creditors of the corporation without regard as to any personal dealings between such officers and such creditors. 3A *Fletcher* § 1134 at 202. This distinction parallels that between a personal shareholder suit, and a derivative suit. See *e.g. Sutter v. General Petroleum Corp.*, 28 Cal.2d 525, 170 P.2d 898, 901 (1946). While the trustee may not bring personal shareholder actions, he may certainly bring those actions for which the injury to the shareholders is derived from the harm to the corporation. *Schmitt v. Jacobson*, 294 F.Supp. 346 (D.Mass.1968).

■ This same rationale applies to the trustee in his capacity as a creditor. Where the injury alleged is primarily to the corporation, and is an injury to the plaintiff creditor only insofar as it decreases the assets of the corporation to which he must look for satisfaction of his debt, then the suit is for a tort suffered by the corporation, and properly brought by the trustee; if there is a special damage to the creditor suing, not common to other creditors, then it is a personal creditor action which the trustee may not pursue. *See Cissell, supra,* at 793.

■ This distinction is not a mere technicality. The reasoning behind the *Caplin* doctrine is that if the trustee were to adopt the position of particular creditors and bring their personal claims against officers and directors, the trustee would establish that the debtor was *in pari delicto* with the wrongdoers. *Caplin, supra,* 406 U.S. at 430, 92 S.Ct. at 1686. In such a case, the trustee has a conflict of interest, for his duty under the Code is to object to unwarranted claims against the estate, rather than act as an advocate of creditors asserting those claims. *Cissell, supra,* at 793.

However, this problem arises only where the action asserted is for a direct and personal injury to a third party caused by a corporate fiduciary. If an officer, acting within the scope of his agency, or for the benefit of the corporation, commits a direct tort against a third party, the corporation is also liable. *See e.g. El Rancho, Inc. v. First National Bank of Nevada,* 406 F.2d 1205, 1215 (9th Cir.1968), *cert. denied* 396 U.S. 875, 90 S.Ct. 150, 24 L.Ed.2d 133 (1969); *Boise Dodge, Inc., v. Clark,* 92 Idaho 902, 453 P.2d 551, 554–555 (1969). If he were to bring the creditor's claim against the officer, the trustee would also establish the corporation's liability.

■ The trust fund doctrine and the claim of breach of fiduciary duty are not *personal* creditor claims. Strictly speaking they "belong" to the corporation, while creditors most often "assert" them, as they are forced to do when the wrongdoers are the principal officers and shareholders. See *MortgageAmerica, supra,* at 1276. The trustee adopts the position of a creditor only to defeat the defense of ratification; ultimately, however, the trustee seeks recovery for injury to the *corporations,* which injuries creditors only "derivatively". In pursuing these claims, the trustee does not establish that the corporations are *in pari delicto* in causing their own harm. Therefore, there is no more conflict of interest in the trustee bringing these actions in his creditor capacity as there is in his avoiding preferential and fraudulent transfers. Since all these actions are for the benefit of creditors in general, and may be availed by "any" creditor without regard to his personal dealings with the defendants, the trustee's action is an appropriate application of his status as a "supposed or hypothetical" creditor under § 544(a). *See 4 Collier on Bankruptcy* ¶ 544.02 (15th ed. 1985).[12]

**12.** The purpose of § 70(c) of the Bankruptcy Act—predecessor of § 544(a) of the Code—was to enable the trustee to invoke rules protecting creditors *generally,* but not to avail himself of provisions limited in their protection to creditors who extended credit at particular times, under particular circumstances, or for particular kinds of indebtedness. *See 4B Collier on Bankruptcy* ¶ 70.48 at 588–589 (14th ed.). To this end, the Act was always intended to give the trustee the status of an ideal, though hypothetical, creditor. *Id.* ¶ 70.50 at 611 (the trustee is himself in the position of a creditor as a matter of law; that is his legal status) *See In re Con-*

## III. ALTER EGO and PARTNERSHIP

 In case the recovery under the breach of duty actions is insufficient to pay all claims against the estate, the trustee seeks to recover the balance pursuant to both the alter ego theory, and under partnership law. In essence, the trustee argues that the defendants were engaged in a joint venture partnership, and that this partnership, as well as the individuals, are the alter egos of the debtors. A successful alter ego action results in a finding that the defendants are personally liable for all corporate debts. *Frank McCleary Cattle Co. v. Sewell*, 73 Nev. 279, 317 P.2d 957 (1957). Under partnership law, partners are liable for the debts of the partnership. Uniform Partnership Act, Nev.Rev.Stat. § 87.150. This latter doctrine has been incorporated into the Bankruptcy Code at § 723(a).

 A partnership is an association of two or more persons to carry on as co-owners a business for profit. Nev.Rev.Stat. § 87.060. There is no one exclusive test in determining whether an agreement is one of joint venture or partnership; the relationship depends upon the intent of the parties. *Las Vegas Machine & Engineering Works, Inc. v. Roemisch*, 67 Nev. 1, 9, 213 P.2d 319 (1950). The receipt of a share of the profits is *prima facie* evidence of a partnership. Nev.Rev.Stat. § 87.070, sub. 4.

 The Menicuccis did not profit from the businesses; the only funds they received were for the repayment of loans. The plaintiff argues that there was nevertheless a present agreement to share profits when they were generated, and that this is sufficient to constitute a partnership. However, from the dealings among the par-

ties, this appears to be merely an agreement to agree some time in the future to a sharing of profits. There was no present partnership contract, express or implied. *See e.g. Barry v. Zinran (In re Tingle )*, 34 B.R. 676, 677 (Bankr.S.D.Fla.1983). Therefore, there can be no partnership liability on the part of the Menicuccis.

 As for defendants Vogt and Buchanan, they did have at the time of their involvement, an explicit, present agreement to share profits, and did in fact share the profits of these businesses. The defendants had an understanding between themselves that they could each freely use the funds generated by the debtors. For the most part, these funds were not taken as interest on loans, salary, rent or any of the exceptions to the presumption set out in § 87.070. Therefore, Vogt and Buchanan have failed to rebut the plaintiff's *prima facie* case.

 The defendants contend that they could not have received profits, because the debtors never made a profit in the accounting sense. There is no reason to so limit the scope of the term "profit". Individuals can profit from the operation of a business by withdrawing funds, even though the business is a loosing proposition from the beginning, as was the case here.

 If the *prima facie* case were not to apply here plaintiff has nonetheless succeeded in proving the existence of a partnership. The defendants had a present agreement and intent to share profits whenever such profits were generated. To this end, they each made a contribution: Vogt contributed her time, assets, and

---

sorto *Construction Co., Inc.*, 212 F.2d 676, 678 (3rd Cir.1954) (trustee does not derive his powers from particular creditors).

Since certain remedial rights flow by state law only to one who is a creditor with an execution returned unsatisfied, § 70(c) was amended in 1966 to include this status, now found at Code § 544(a)(2). This was to ensure that the trustee has "the whole bundle of rights accorded by state law to a creditor who has at least obtained a judgment, and to protect the trustee against quirks of local . . . law." 4B

*Collier, supra* § 70.64 at 730–731. The return of a writ of execution unsatisfied indicates a lack of leviable assets at law, and an exhaustion of legal remedies, thus opening the way for appropriate equitable relief. *Id.* ¶ 70.65 at 733. As discussed above, a creditors' suit invoking the trust fund doctrine is such a remedial right which may be availed by creditors generally who have exhausted their legal remedies. See note 9, *supra*. Therefore, the trustee has standing to invoke this doctrine under § 544(a)(2).

credit, while Buchanan contributed his purported management abilities. Their agreement was that they would begin splitting the profits after Vogt had been repaid her advances. There was a common interest between them in their endeavor to operate these businesses for their ultimate profit. They referred to each other as partners. Therefore, unlike the case of the Menicuccis, only the receipt of profits was subject to a condition precedent, rather than the existence of the partnership agreement itself.

Although it was conceded that Vogt was an owner, Buchanan argues that he had no ownership interest in the businesses. However, his behavior in freely using funds for his personal purposes indicates his ownership. Further, because Vogt approved of Buchanan's use of the funds, they had a common understanding and arrangement of co-ownership.

■ All partners have equal rights in the management and control of partnership business. Nev.Rev.Stat. § 87.180, sub. 5. The defendants did in fact exercise joint control as partners. They may have performed different services, and to a great extent Vogt delegated management decisions to Buchanan, but this does not preclude the finding of a partnership. Partners have an equal *legal* right to manage, but "actual management may be delegated to a single partner or co-adventurer without destroying their relationship as co-adventurers or partners." *Roemisch, supra,* 67 Nev. at 11, 213 P.2d 319; *Northern Lights Motel, Inc. v. Sweaney,* 561 P.2d 1176, 1187 (Alaska 1977), *rehearing denied,* 563 P.2d 256 (1977). Furthermore, Vogt personally delegated management decisions to Buchanan, and held him out as her *personal* agent. Therefore, she was well aware of her legal right to manage.

■ Although defendants argue that they had no intent to operate as partners, their behavior belies their intentions. Moreover, subjective intent is not the test; rather, the Court must look to

the intent of the parties to do the things which constitute a partnership.... It is

immaterial that the parties deign not to call their relationship, or believe it not to be, a partnership, especially where the rights of third parties are involved.

*Kaufman-Brown Potato Co. v. Long,* 182 F.2d 594, 599 (9th Cir.1950). These defendants shared profits openly and freely as co-owners, and exhibited a joint, mutual interest in these businesses. The substance, if not the form, of their relationship was one of partners in a joint endeavor. *See also Nelson v. Seaboard Surety Co.,* 269 F.2d 882, 887 (8th Cir.1959).

■ Vogt and Buchanan individually, as well as the partnership consisting of each of them, are liable for the corporations' debts as alter egos of the debtors. Under Nevada law, the elements of an alter ego action are:

(1) The corporation must be influenced and governed by the person asserted to be its alter ego; (2) There must be such unity of interest and ownership that one is inseparable from the other; (3) The facts must be such that adherence to the fiction of separate entity would sanction a fraud or promote injustice.

*McCleary Cattle, supra,* 73 Nev. at 282, 317 P.2d 957. The specific factors which might indicate that the *McCleary* elements have been met include:

[C]ommingling of funds and other assets, the failure to segregate funds ..., and the unauthorized diversion of ... corporate assets to other than corporate uses; the treatment by an individual of the assets of the corporation as his own; the failure to obtain authority to issue stock or to subscribe to or issue stock; the holding out by an individual that he is personally liable for the corporation's debts; the failure to maintain minutes or adequate corporate records ...; the identification of the ... owners with the domination and control of the [corporation] ...; sole ownership of all the stock ... by one individual or the members of one family ...; the failure to capitalize ... adequately; the total absence of corporate assets and undercapitalization; the

use of the corporation as a mere shell, instrumentality, or conduit for a single venture or business of an individual or another corporation; the concealment and misrepresentation of the identity of the responsible ownership, management, and financial interest, or concealment of personal business activities; the disregard of legal formalities and the failure to maintain arm's length relationships [with the corporation] ...; the diversion of assets from a corporation by or to a stockholder or other person or entity, to the detriment of creditors, or the manipulation of assets or liabilities in another; ... the use of the corporation as a shield against personal liability, or the use of the corporation as a subterfuge in illegal transactions....

*North Arlington Medical Building, Inc. v. Sanchez Construction Co.*, 86 Nev. 515, 522–523 n. 3, 471 P.2d 240 (1970). Most if not all of these factors are present here.

It may be insufficient to approach the matter by using a "checklist"; however, in this case, each *McCleary* element has been met. As for the first element, all of these defendants influenced and governed these corporations. Menicucci was in total control of WWF. Vogt and Buchanan ultimately governed and controlled all the corporations. Together, they were the debtors' motivating and investing force. *See Caple v. Raynel Campers, Inc.*, 90 Nev. 341, 343, 526 P.2d 334 (1974). Vogt argues that Buchanan was the sole dominating figure; however, he acted as her agent, pursuant to their agreement that they would operate these corporations for their personal profit. Having delegated much of the management to Buchanan, Vogt influenced and governed through him. From another perspective it is apparent that the partnership dominated and controlled the debtors, for they were operated as they were pursuant to the joint endeavor of Vogt and Buchanan.

The second *McCleary* element—unity of interest and ownership—does not apply to Menicucci, for he had at best only a contingent financial interest in these businesses.

He received no funds as an owner. As for Vogt and Buchanan, however, the analysis follows that of the partnership findings. Since no shares were ever issued, the only evidence of ownership interest is from the behavior of the defendants. Each freely took funds from the corporations, as if the funds were their own, with the approval of the other. This behavior illustrates their joint ownership interest in the debtors. For the reasons already discussed, their partnership had a direct unity of interest and ownership in the businesses, for it was pursuant to the agreement to operate the debtors as co-owners for profit that the individuals did in fact profit.

As for the third *McCleary* element, the plaintiff need not prove actual fraud; it is enough if the recognition of the corporations as separate entities would result in injustice. *McCleary, supra,* 73 Nev. at 282, 317 P.2d 957. In *Carson Meadows, Inc. v. Pease,* for example, the plaintiff alleged that the corporation's president had engaged in a fraudulent investment scheme; yet the plaintiff's inability to prove the elements of fraud did not affect the president's alter ego liability. 91 Nev. 187, 533 P.2d 458 (1975).

It would promote an injustice, if not sanction a fraud, if the Court were to recognize the separate existence of the corporations. Undercapitalization is always an important factor in finding an injustice. *North Arlington, supra,* 86 Nev. at 522, 471 P.2d 240. *See e.g. Deal v. 999 Lakeshore,* 579 P.2d at 780, where one factor supporting the alter ego finding was that the defendant had capitalized a multi-million dollar corporation with $1000. Inadequate capitalization from the inception of a corporation's existence may indicate fraud and bad faith. *In re Fulghum Construction Corp.,* 14 B.R. 293, 301 (M.D.Tenn. 1981), *aff'g* 7 B.R. 629 (Bankr.M.D.Tenn. 1980), *modified,* 706 F.2d 171 (6th Cir. 1983). *See also Bast v. Orange Meat Packing Co., Inc. (In re G & L Packing Co., Inc.),* 20 B.R. 789, 805–806 (Bankr.N. D.N.Y.1982), *aff'd* 41 B.R. 903 (D.C.N.D.N. Y.1984). As discussed above, see note 6,

these businesses were never established on an adequate financial basis. The "pyramid" nature of the financial functioning of the corporations would itself justify an application of the alter ego doctrine. In addition, there are the well documented conversions of funds while the debtors were insolvent, and the almost total failure to keep records, which further contributed to the insolvency of the businesses. These defalcations directly caused the harm to creditors. *Cf. GNB, Inc. v. Gordon, (In re Palmer, Inc.)*, 15 B.R. 276 (N.D.Ill.1981). As one court remarked,

> when a corporate stockholder himself … disregards the separate entity of the corporation to the prejudice of [creditors], he can scarcely complain if the Court judges him by his conduct and likewise disregards the corporate entity in order to enforce [those creditors' rights].

*Harrison v. Puga*, 4 Wash.App. 52, 480 P.2d 247, 254 (1971).

Defendants again object to the trustee's standing to bring the alter ego and partnership actions. First they allege that the trustee has no authority to seek contributions from the partners of a debtor, citing *Stodd v. Goldberger*, 73 Cal.App.3d 827, 141 Cal.Rptr. 67, 74 (1977). They also contend that the trustee has sought to establish a partnership by estoppel, which cannot be a debtor under the Code. *See e.g. In re Ganaposki*, 27 F.Supp. 41 (M.D.Pa. 1939). For these reasons, the defendants objected to the admission of testimony from certain "investors" regarding representations made by the defendants as to their partnership relationship, and their personal liability for debts. Finally, defendants argue that the trustee is not authorized to bring the alter ego claim by either § 541 or § 544(a), reasoning that "alter ego" is a right of action which belongs to creditors personally, in which the corporation has no interest, citing *Stodd v. Goldberger, supra,* and *Caplin v. Marine Midland, supra.*

■ It is correct that a trustee may not usually seek contribution from the partners of the debtor. However, in this case, the trustee alleges that the debtors are themselves a partnership or the alter ego of a partnership, rather than partners of the defendants. The trustee is authorized to collect contributions from the partners of a partnership debtor under Code § 723. Moreover, the partnership alleged by the trustee and found by the Court is an actual partnership, rather than a partnership by estoppel. The testimony of witnesses regarding certain representations is relevant to illustrate the actual understanding among the defendants as to their legal relationship. This evidence is also relevant to the alter ego claim, for it may indicate "the existence and intentional character of control and domination", thus supporting an alter ego finding. *Soderberg Advertising, Inc. v. Kent-Moore Corp.*, 11 Wash. App. 721, 524 P.2d 1355, 1364 (1974).

The defendants' contention that the trustee has sought to establish a partnership by estoppel is apparently based on their misunderstanding of the Nevada alter ego doctrine. Their argument is this: The alter ego claim necessarily involves the elements of deceptive conduct on the part of those alleged to be the alter ego that they would be responsible for corporate debts, and reasonable reliance thereon by the creditors, *i.e.,* the elements of equitable estoppel. Therefore, the trustee in arguing that the partnership of Vogt and Buchanan is the alter ego of the debtors, would succeed in establishing only a partnership by estoppel. However, the Court has found that the debtors were run as actual partnerships, and that the defendants were partners in fact—there was an actual partnership agreement between them. It is unnecessary to invoke the alter ego doctrine as a middle step. Furthermore, an examination of the Nevada alter ego doctrine, its rationale, and the circumstances in which it has been applied, indicates that the doctrine is not based necessarily on the elements of estoppel.

In the typical alter ego situation, the creditor does not in fact rely on the personal credit of the individual officers and shareholders. Rather, the creditor clearly

contemplates a contractual relationship with the corporation. In some sense, the Court invokes a legal presumption that the creditor has "relied" on the *corporation's* credit:

> [I]n entering into such a relationship with corporate entities, the [creditors] are entitled to rely upon certain assumptions, one being that the corporation is more than a mere shell—that it has substance as well as form. When, however, it results that a corporation is such only in name, the Courts ... will disregard the corporate entity....

*Iron City Sand & Gravel v. West Fork Towing Corp.* 298 F.Supp. 1091, 1099 (D.C. N.D.W.Va.1969), *rev'd on other grounds,* 440 F.2d 958 (4th Cir.1971). Similarly, where two business entities are so closely related as to give the appearance that they are one, a court might infer "constructive fraud" from a presumption of public confusion. *See e.g. Gordon v. Aztec Brewing Co.,* 33 Cal.2d 514, 203 P.2d 522 (1949). However, in neither *Iron City* nor *Aztec Brewing* did the court require proof of intent to deceive on the part of the defendant, or actual reliance on the part of the plaintiff.

The Nevada Supreme Court has applied the alter ego doctrine in many cases without mentioning "reliance" or "estoppel", and the facts of those cases do not appear to support the application of equitable estoppel. *See e.g. McCleary Cattle, supra; Caple v. Raynel Campers, Inc., supra. See also Houston Oil Material Co., Inc. v. Stuard,* 406 F.2d 1052 (5th Cir.1969), cited with approval in *Lipshie v. Tracy Investment Co., Inc.,* 93 Nev. 370, 376–377, 566 P.2d 819 (1977), as an appropriate application of "alter ego" to prevent injustice. In *Carson Meadows, supra,* the court explicitly held that the plaintiff's failure to prove the elements of misrepresentation and rea-

sonable reliance thereon did not affect the alter ego claim. The court did not mention "reliance" or "estoppel" in connection with piercing the corporate veil.

There are a few Nevada cases in which the court refused to pierce the corporate veil, and in explaining the result stated that the plaintiff had failed to prove either an essential *McCleary* element, or that he had relied upon the personal credit of the alleged alter ego. *See e.g. Ecklund v. Nevada Wholesale Lumber Co.,* 93 Nev. 196, 199, 562 P.2d 479 (1977); *Baer v. Amos J. Walker, Inc.,* 85 Nev. 219, 221 452 P.2d 916 (1969). In other cases, the court mentioned "reliance" as one factor in applying the alter ego doctrine. For example, in *Deal v. 999 Lakeshore Assoc., supra,* the court noted that several creditors had relied on the reputation of the defendant. 579 P.2d at 780. However, since *Deal* was brought as a class action, it is apparent that the court did not require each creditor to prove actual reliance in order to justify a finding of alter ego. These cases and others like them indicate that the Nevada Supreme Court might think of estoppel as a separate rationale for piercing the corporate veil, or as *one* method of showing that the conduct of the alleged alter ego caused a harm to the complaining creditor. These cases do not support the proposition that it is necessary for a creditor to prove actual reliance upon deceptive conduct indicating that the alleged alter ego would be liable for corporate debts.[13]

 The theories of alter ego and estoppel as discussed here[14] are completely distinct. An alter ego action may be based solely upon the actual relationship between a corporation and a controlling individual such that the law deems them to be identical and inseparable from each other. See *McCleary Cattle,* 73 Nev. at 282, 317 P.2d 957; *Sefton v. San Diego Trust & Savings*

---

**13.** The Court disagrees with the analysis of the Nevada alter ego theory advanced in *Matter of Twin Lakes Village, Inc.,* 2 B.R. 532, 541–542 (Bankr.D.Nev.1980), to the extent that it differs from that presented here.

**14.** To some extent, every application of the alter ego theory involves the invocation of equitable estoppel, because the defendants alleged to be the alter egos are estopped from asserting the corporate form as a defense to their personal liability for corporate debts. *See e.g. Harrison v. Puga,* 480 P.2d at 254.

*Bank,* 106 P.2d 974, 984 (Cal.App.1941). Liability for corporate debts follows automatically from the identity of the "two". On the other hand, equitable estoppel may be invoked when a creditor has reasonably relied on conduct of the corporation or the individuals in control of it "which would indicate either the absence of a corporate form or the assumption of liability by a person or entity controlling an openly visible corporation." *Twin Lakes Village, supra* note 13, at 542. In the case of estoppel, the creditor must of course be aware of and rely on the alter ego's manner of relating to the corporation; but the court need not find all of the *McCleary* elements in order to apply estoppel. *See e.g. Swartout v. Grover Collins Drilling Engineers,* 75 Nev. 297, 339 P.2d 768 (1959), in which the court held the defendant personally liable for corporate debts on the grounds that he had represented that he would be liable; the court did not mention "alter ego" or the *McCleary* elements. Conversely, creditors may be prejudiced by an individual's disregard of the corporate entity—*e.g.,* by failing to capitalize and to maintain corporate records, and by misappropriating corporate funds, as was the case here—without the creditor being aware of and relying upon that conduct as an indication that the individual is personally liable for corporate debts.[15]

■ To conclude this digression, even if the trustee must invoke the alter ego doctrine as an intermediate step in his quest to hold the defendants liable as partners pursuant to Code § 723, this does not amount to an attempt to establish a partnership by estoppel. Although the testimony presented indicates that particular creditors might be able to hold these defendants personally liable for their claims by invoking the doctrine of partner by estoppel, Nev.Rev.Stat. § 87.160, the trustee does not seek to represent particular creditors who may have relied upon certain representations made by these defendants. Rather, the trustee attempts to establish the "identity" of the individuals and their partnership with the debtors, based solely upon the manner in which the defendants operated the debtors, and regardless of whether particular creditors may have relied upon this conduct or were even aware of it.

■ The trustee's standing to bring the alter ego action follows from the nature of the Nevada alter ego doctrine. Since any creditor may invoke the doctrine regardless of the particular nature of his debt or his particular dealings with the alleged alter egos, the trustee may so act in his creditor capacity under 11 U.S.C. § 544(a). *Long v. McGlon,* 263 F.Supp. 96 (D.S.C.1967) (trustee has standing pursuant to Act § 70(c), predecessor of Code § 544(a)); *Henderson v. Rounds & Porter Lumber Co.,* 99 F.Supp. 376 (W.D.Ark.1951).[16]

Defendants cite *Stodd v. Goldberger,* 141 Cal.Rptr. at 70–73, for the proposition that the trustee has no standing to bring the alter ego action. The *Stodd* court likened the alter ego claim to the "personal" credi-

**15.** For cases explicitly distinguishing the theories of alter ego and estoppel, see *Soderberg Advertising, Inc. v. Kent-Moore Corp.,* discussed *supra; Krivo Industrial Supply Co. v. National Distillers and Chemical Corp.,* 483 F.2d 1098, 1102–1103 (5th Cir.1973). See also *In re Palmer,* 15 B.R. at 280–281, where the court remarked that the plaintiff had been unable to prove the elements of either estoppel or piercing the corporate veil.

**16.** There are in addition many cases in which the trustee was permitted to invoke the alter ego doctrine, without comment by the court as to the trustee's standing to do so. See e.g. *In re Palmer, supra; In re Fulghum Construction Corp.,* 14 B.R. 293 (M.D.Tenn.1981); *Bartle v. Homeowners Cooperative, Inc.,* 309 N.Y. 103,

127 N.E.2d 832 (1955). In *Martin v. Development Co. of America,* 240 Fed. 42 (9th Cir.1917), the Ninth Circuit expressly declined to decide the question of the trustee's standing, and proceeded to address the merits of the alter ego claim. More recently, in *Suhl v. Bumb,* the court held that the bankruptcy court did not have summary jurisdiction to address a trustee's conversion claim, in which the trustee sought to reach all of the transferee's assets. The court remarked that it did not intend its decision "to indicate any opinion that the assets sought to be reached ... cannot, or should not, be reached in a proper plenary proceeding, either under an alter ego theory or otherwise." 348 F.2d 869, 874 (9th Cir.1965).

tor actions considered in *Caplin, supra,* and *Cissell supra,* and remarked:

> [The trustee] is not an appropriate general representative of creditors.... [He] has a statutory duty to object to claims which may be improper, and it ill becomes him to assume the role of an advocate of parties asserting those claims.

141 Cal.Rptr. at 72, citing *Cissell v. American Home Assurance Company,* 521 F.2d at 793. Similarly, in *Norman v. Riddell (In re Green Valley Seeds, Inc.),* the court noted that "the trustee does not have the right to step into the shoes of an individual creditor and pursue that creditor's claim against an officer." 27 B.R. 34, 36 (Bankr. D.Or.1982), citing 4 *Collier on Bankruptcy* 15th ed. ¶ 541.10[8].

The Court has already discussed the nature of personal creditor actions and the possibility of a conflict if the trustee attempts to pursue those claims against the fiduciaries of the debtor corporation. The alter ego action is unlike those personal creditor claims.

As explained above, the Nevada alter ego doctrine is based on the concept of an identity between the alter ego and the corporation. In order to establish this identity, the creditor need only present evidence as to the manner in which the alleged alter ego interacted with the corporation, and the prejudice caused to creditors by this behavior. The doctrine need not rest upon any consideration of the particular creditor's dealings with the defendants. Therefore, contrary to the *Green Valley* court's view, the trustee need not step into the shoes of a *specific* creditor in order to bring the alter ego action; he simply acts as a creditor *qua* creditor pursuant to § 544(a). The section of *Collier* cited for support in *Green Valley* discusses the trustee's powers under § 541, rather than his creditor status under § 544(a).

The alter ego doctrine is much more like the trust fund doctrine than like the personal creditor claims which so concerned the *Cissell* and *Caplin* courts. Each creditor has a claim against the bankruptcy estate. In bringing the alter ego action, the trustee does not help establish these claims, but merely seeks to pursue all funds available under state law to pay the creditors. *Long v. McGlon, supra,* at 98. This is because "alter ego" is not a substantive cause of action which may be asserted against the *corporation;* it is an equitable, remedial doctrine which may be availed by "any" creditor under certain circumstances. In pursuing the alter ego's assets, the trustee does not establish that the corporation is *in pari delicto* with the wrongdoers: The corporation is not at fault for being the alter ego of the defendants, just as it is not liable for the defendants' breach of fiduciary duty to it. Therefore, contrary to the *Stodd* court's view, there is no conflict in the trustee bringing this action.

The *Cissell* case, relied upon by the *Stodd* court, presented a very different situation. There, in order to establish the defendant-insurer's liability to certain creditors, the trustee first would have had to establish the debtor-insured's underlying liability to those creditors. On the other hand, in order to invoke the Nevada alter ego doctrine, it is sufficient for the trustee to act as a "hypothetical" creditor who has already obtained a judgment and exhausted his legal remedies against the debtor. Since *any* creditor in this position may proceed to avail himself of the equitable alter ego doctrine, so may the trustee under 11 U.S.C. § 544(a)(2). See note 12, *supra.*

The *Stodd* court also remarked that the trustee represents creditors only in the sense of marshaling, preserving or otherwise administering *assets of the estate.* 141 Cal.Rptr. at 72. The court appears to have overlooked the fact that under the Bankruptcy Act § 70(c), the trustee was given all the rights, remedies, and powers of a lien creditor as to *all property* which, under state law, may be available to pay creditors' claims. Section 70(c) of the Act had been amended in 1952 to give the trustee a lien on *any* property which a creditor might have reached; the amendment eliminated the previous restriction that the prop-

erty be property of the estate or that it be in the possession or under the control of the debtor. 4A *Collier* ¶ 70.29 at 435 n. 41 (14th ed.). The debtor need not have even a claim of title at the time of bankruptcy, if a creditor could have nevertheless acquired a lien on the property. 4B *Collier* at 574. This expansion of the trustee's lien rights under the Act was carried over to the Code at § 544(a)(1). Its "plain and literal import" gives the trustee of a corporate debtor a lien on all the nonexempt property of directors, officers, and stockholders, under the same conditions that creditors might have reached that property. 4A *Collier* at 435 n. 41. Therefore, the trustee's alter ego claim may be construed as an action to establish the extent of his lien under § 544(a)(1), which the trustee certainly has standing to pursue.

The trustee's standing may also be based on 11 U.S.C. § 541 and § 704. The trustee has the duty to collect and reduce to money the property of the estate. § 704(1). Section 541(a)(1) provides that the estate is comprised of all legal and equitable interests of the debtor, including any chose in action which the debtor might have had against others. 4 *Collier on Bankruptcy* ¶ 541.01 (15th ed.). Under the Nevada alter ego doctrine, the corporation has, in some sense, an equitable interest in the assets of its alter ego, because the corporation and the alter ego are identical. The trustee brings the alter ego action to establish this identity. He certainly has standing to seek a declaratory judgment that certain assets are in equity, if not in law, assets of the estate, and thereby subject to his administration.

Some courts have held that the trustee may not enforce alter ego liability for the benefit of creditors of a debtor corporation, on the grounds that the alter ego doctrine does not create assets for the estate, but merely shifts liability for corporate debts to a third party. *See e.g. Garvin v. Matthews*, 193 Wash. 152, 74 P.2d 990, 992 (1938). However, this approach is inconsistent with the "identity" theory of Nevada alter ego law. In this state, the alter ego is not considered to be a "third party" to whom liability is shifted. In the seminal case of *McCleary Cattle*, the Nevada Supreme Court noted:

... the [creditors] are not seeking to reach assets in the hands of a third party ... [or] to substitute or add a new party to the old action. For the purposes of execution, the [corporation] and [its alter ego] are to be regarded as identical.

73 Nev. at 282, 317 P.2d 957. The Court of Appeals for the Ninth Circuit has followed this rationale in remarking that a bankruptcy trustee could be deemed to be in constructive possession of the defendant's assets "by a determination of alter ego, *i.e.*, that the [defendant] and the bankrupt are pragmatically one and the same." *Suhl v. Bumb*, 348 F.2d at 873.[17] Other courts have held that the assets of a debtor-corporation's alter ego are assets of the estate. *See e.g. Freehiling v. Nielson (In re F & C Services, Inc.)*, 44 B.R. 863, 11 C.B.C.2d 1126, 1130 (Bankr.S.D.Fla.1984), and authorities cited therein. *See also Sampsell v. Imperial Paper & Color Corp.*, 313 U.S. 215, 61 S.Ct. 904, 85 L.Ed. 1293 (1941).[18]

■ Defendants further argue that § 541 provides the trustee with the authori-

---

17. Under the former Bankruptcy Act, the bankruptcy court had "summary" jurisdiction over all property in the actual or "constructive" possession of the debtor. *See generally* 2 *Collier* ¶¶ 23.03–23.06 (14th ed.).

18. In *Sampsell*, the United States Supreme Court expressed approval of the bankruptcy referee's use of the alter ego doctrine to prevent the debtor from avoiding the summary jurisdiction of the bankruptcy court by placing all of his assets in a "sham" corporation. The court held that since the property of the alter ego was property of the debtor's estate to be adminis-

tered for the benefit of his creditors, an unsecured creditor of the alter ego who had knowledge of the transfers was not entitled to priority against the alter ego's assets, but must share *pro rata* with the other creditors of the debtor.

The defendants might argue that these cases concern only the transfer of specific property from the debtor to its alleged alter ego; however, the rationale of the cases rests squarely on the alter ego theory, which, under Nevada law, subjects *all* of the alter ego's assets to the payment of the corporation's debts.

ty to bring only those causes of action which the debtor could have brought. They point out that there are no Nevada cases in which a corporation has been allowed to pierce its own corporate veil, and contend that such an action would be inherently inconsistent. However, defendants again misunderstand the nature of trustee's action. The estate includes, *but is not limited to,* choses in action belonging to the debtor. The estate also includes all legal and equitable interests of the debtor. As discussed above, a Nevada corporation has an equitable interest in the assets of its alter ego. Therefore, the trustee does not bring this as a chose in action on which the debtor-corporation could have sued outside of bankruptcy; he brings it simply to establish the identity of the alter egos with the corporations in order to determine what are the assets of the estate.

Furthermore, it is not at all clear that a corporation would be forbidden to pierce its own corporate veil in a non-bankruptcy context. There is no inconsistency in allowing such an action. The alter ego doctrine is an equitable remedy which may be invoked for some purposes and not others. It may be utilized when equity requires, such as to protect innocent parties, rather than as a defense to the liability of defaulting fiduciaries. *See e.g. Hoss v. Purinton,* 229 F.2d 104, 108 (9th Cir.1955), *cert. denied* 350 U.S. 997, 76 S.Ct. 547, 100 L.Ed. 861 (1956); *United States v. Goldberg,* 206 F.Supp. 394, 405–406 (E.D.Pa.1962), *aff'd* 330 F.2d 30 (3rd Cir.), *cert. denied* 377 U.S. 953, 84 S.Ct. 1630, 12 L.Ed.2d 497 (1964). The corporation may be thought of as a separate legal entity which "has an interest of its own in assuring that it can meet its responsibility to its creditors", *Bangor Punta Operations,* 417 U.S. at 726, 94 S.Ct. at 2590 (Marshall, J. dissenting), while at the same time allowing it to argue that it should be deemed to be identical to its alleged alter ego for purposes of paying those creditors. There is only a practical—not a legal or logical—difficulty in a corporation's bringing an alter ego action in its own name: The defendants who so completely dominate the corporation as to constitute its alter egos are not likely to institute an action to determine their own liability for corporate debts. Therefore, it is not surprising that the parties can produce no such case. The corporation needs an independent voice, such as a trustee in bankruptcy, in order to act to protect its creditors.

Pursuant to § 541(a)(3), the estate also includes any interest in property which the trustee recovers under § 723. The latter section provides that in a case concerning a partnership, the trustee may seek contribution from each general partner for the amount of any deficiency in the partnership assets to pay creditor claims. The trustee has standing to seek a declaratory judgment for a determination of the status of the debtor, *i.e.,* whether this case "concerns a partnership". The Court's finding that the partnership of Vogt and Buchanan is the alter ego of the debtors brings the trustee within the provisions of § 723, for the debtors are identical to this partnership.

As a final assault on the trustee's standing, the defendants contend that under both the Nevada and Federal Rules of Civil Procedure 17(a), any action must be prosecuted in the name of the real party in interest. They argue that if the trustee wishes to bring these actions as a representative of all the creditors, he must proceed by class action, and meet the requirements of Rule 23. The defendants have cited no authority—and the Court can find none—for the proposition that the trustee, in acting under § 541, § 544, or any other provision which is intended to benefit creditors generally, must proceed by class action. Rule 17(a) itself provides, *inter alia,* that a trustee of an express trust, or any other party authorized by statute, may sue in his own name without joining with him the party for whose benefit the action is brought. Bankruptcy Code § 323 deems the trustee to be the representative of the estate, and authorizes him to sue and be sued in his own name. Therefore, the trustee represents creditors as a matter of law, for he acts not for his own personal bene-

fit, but for that of all creditors, pursuant to his statutory authority.

## IV. FRAUDULENT and PREFERENTIAL TRANSFERS

The plaintiff's causes of action to recover fraudulent conveyances overlap with, and are almost identical to, those for conversion. Bankruptcy Code § 548(a)(2)(A) provides in part:

The trustee may avoid any transfer of .... the debtor['s] property ... within one year before the date of the filing of the petition, if the debtor ...

(2)(A) received less than a reasonably equivalent value in exchange for such transfer ... and

(i) was insolvent on the date [of the] transfer ... or became insolvent as the result of such transfer ...., [or]

(ii) was engaged in business ... for which any property remaining with the debtor was an unreasonably small capital; ...

▋ Of the funds converted by Buchanan, $42,007.48 was taken in the year before the bankruptcy filing. It is obvious that the debtors were insolvent during this year, according to the "balance sheet test" of insolvency. *See* 11 U.S.C. § 101(26)(A); *Fulghum Contruction*, 7 B.R. at 632. In mid-1981, liabilities greatly exceeded assets; by the date of the petition, the corporations had lost $4 million more. The Court need not see financial statements at various intervals during this time period in order to infer that the debtors were continuously insolvent. *Lancaster v. Bank of Washington Cty. (In re Tuggle Pontiac-Buick-GMC, Inc.)*, 31 B.R. 49, 52 (Bkrtcy. E.D.Tenn.1983). The corporations having never been adequately capitalized, the trustee also meets the conditions of subsection (ii). As for Vogt, during the year in question she received a total of $990,941.44. However, since over the total period of her involvement she converted only $263,141.65, the amount she received in the final year represents both fraudulent conveyances, and the repayment of past advances. Therefore, the total funds recoverable from

Vogt under § 548 is the same as the figure for conversion—$263,141.65; the balance represents preferences.

The trustee seeks to recover as preferences these funds paid to Clair Vogt in the last year before bankruptcy, as well as transfers to the Menicuccis and their corporation, Menicucci Insurance Services, Inc. Under Bankruptcy Code Section 547(b) the trustee may avoid any transfer of an interest of the debtor in property: (1) to or for the benefit of a creditor; (2) for or on account of an antecedent debt; (3) while the debtor was insolvent; (4) made within 90 days before the date of the filing of the petition, or between 90 days and one year if the creditor was an insider and had reasonable cause to believe the debtor was insolvent at the time of the transfer; and (5) that enables the creditor to receive more than it would have received if the transfer had not been made and the debtor's estate were liquidated according to the provisions of the Bankruptcy Code. As this Court has previously noted in *Daniel v. United States Dept. of Treasury (In re R & T Roofing Structures & Commercial Framing, Inc.)*, 42 B.R. 908, 914 (Bankr.D.Nev. 1984), the purpose of the preference section is both to protect a financially troubled debtor by discouraging the creditors' "race to the courthouse", and, more important, to effect an equitable distribution of the debtors' estate.

▋ The Court has already addressed element three: The debtors were insolvent during the entire year prior to the bankruptcy filing. There is no real disagreement as to the applicability of elements one and two to Clair Vogt. Upon her advancing funds to the corporations, she had a claim for the funds advanced. She therefore is a creditor within the broad provisions of the Bankruptcy Code § 101(9) and (4). *Fulghum Construction Co., supra,* at 632. As for the second element, the corporations owed a debt to Clair Vogt on account of her advances. The discharge or reduction of such obligations constitutes the payment of antecedent debt within the meaning of § 547(b)(2). *Merrill v. Abbott*

*(In re Independent Clearing House Co.),* 41 B.R. 985, 1011 (Bankr.D.Utah 1984). As for element four, Clair Vogt was an insider pursuant to 11 U.S.C. § 101(25)(B), as a director, officer, and controlling shareholder of the debtors.

 Clair Vogt, however, strenuously objects to the recovery of preferences made within the entire year before the filing, on the grounds that she had no knowledge of the insolvency. However, the courts are unanimous in holding that "reasonable cause to believe" the debtor is insolvent does not require subjective knowledge of the debtor's particular financial condition nor an actual understanding or belief that a transfer will effect a preference. The trustee must prove only that the creditor had information which would put a prudent business person on notice to inquire as to the debtor's insolvency; the creditor will be charged with knowledge of those facts which a reasonably diligent inquiry would have disclosed. *Constructora Maza, Inc. v. Banco de Ponce,* 616 F.2d 573, 578 (1st Cir.1980); *Fulghum Construction,* 7 B.R. at 638. The circumstances to be considered include: the relation of the parties, their intimacy or lack of it; the usual or unusual nature of the transfer; the opportunities of the creditor for knowledge; the participation of the creditor in the business of the debtor. *Holahan v. Gore,* 278 F.Supp. 899, 902–903 (E.D.La. 1968). Some factors which might indicate insolvency are: undercapitalization, the return of insufficient funds checks, a consistent pattern of overdrafts, and operating losses. *Fulghum, supra,* at 638–639.

 It is not difficult for this Court to conclude that Vogt had reasonable cause to believe the debtors were insolvent. She knew of the debtors' financial setup and undercapitalization, discussed above. She knew of the financial difficulties, for she often advanced funds knowing the purpose was to meet emergency situations, *i.e.,* to pay ordinary operating expenses. Vogt knew or could easily have determined that the debtors were consistently incurring fees for insufficient funds checks. With Buchanan, she controlled the debtors' financial transactions. Therefore, Vogt had reasonable cause to believe, if not actual knowledge, of the debtors' insolvency. *See Fulghum,* 7 B.R. 639.

As for the final element, the transferee must receive more by virtue of the transfer than he would have received if the estate had been liquidated pursuant to the Bankruptcy Code. Here the Court must construct a hypothetical liquidation of the estate. *Independent Clearing House,* 41 B.R. at 1013. The Court need only determine that the creditor would receive less than 100 per cent of its claim. *Id.* In this case it is obvious that creditors will receive less than the full value of their claims. There are several hundred creditors who are still owed in excess of $6 million. The liquid assets of the estate could not possibly exceed $900,000. The major asset is the possibility that the trustee will recover from this litigation against the defendants for breach of duty. However, it is unlikely that this judgment will be collected soon, so as to be available to pay creditors within a reasonable period of time. *See Fulghum Construction,* 7 B.R. at 633. The presence or absence of a dispute as to the validity of a debt is one factor to be considered in discounting its value as an asset. *Constructora Maza,* 616 F.2d at 577. Moreover, the trustee has presented grounds for the court to either subordinate or completely disallow Clair Vogt's claims, if she should file any. Accordingly, the trustee has established the fifth and final preference element.

Clair Vogt has failed to prove that the preferential payments come within any exception to the trustee's avoiding powers as provided by 11 U.S.C. § 547(c). Subsection (c)(4), allows a credit for subsequent new value given by the transferee. However, the trustee has already accounted for this exception by the manner in which he has calculated the preferential transfers: He asks only for the amount transferred over and above the advances made in the final year. Neither do these transfers come within (c)(1) as contemporaneous exchanges

for new value. Like the situation presented in *Fulghum,* 45 B.R. at 115, the transactions between the debtors and Vogt were for the most part in the nature of advances to cover operating expenses. They were intended to be loans from Vogt to be repaid sometime in the future. The preferential transfers were the repayment of these loans. Therefore, they were not in fact, nor were they intended to be, contemporaneous exchanges for new value.

In order to establish a (c)(2) exception, the defendant must prove that the transfer was—

(A) in payment of a debt incurred in the ordinary course of business or financial affairs of the debtor and the transferee;

(B) made not later than 45 days after such debt was incurred;

(C) made in the ordinary course of business or financial affairs of the debtor and the transferee; and

(D) made according to ordinary business terms; ...

In *Fulghum Construction* the court explained that the purpose of the (c)(2) exception was to leave undisturbed ordinary financial relations between a debtor and its creditors. 45 B.R. at 116. *See also Independent Clearing House,* 41 B.R. at 1014–1015. This section protects ordinary trade transactions which are kept current, but was not intended to include transactions outside the normal course of either the debtor's or creditor's business. *Id.*

▮▮ Vogt did not prove that she was in the business of money lending. Furthermore, the evidence shows that Vogt advanced funds as well as her credit because the corporations were undercapitalized, grossly mismanaged, and often could not meet ordinary operating expenses on their own. Short term loans made by a shareholder to a corporation in order to allow the corporation to maintain operations despite its capitalization and management problems do not come within the "ordinary course of business" exception. *See Fulghum,* 45 B.R. at 116. The Court must also be mindful of the fact that the debtors repaid these advances with the funds of public "investors", who now remain unpaid. Therefore, payment was not made in the "ordinary course" of any business of the debtors. Moreover, Vogt did not prove that the transfers were made according to ordinary business terms. § 547(c)(2)(D). To the contrary, the evidence shows that she took these funds at her own convenience and pleasure. In the words of the *Independent Clearing House* court, "[these] transactions were unusual, extraordinary, and unrelated to any business enterprise whose protection was intended by the drafters of Section 547(c)(2)." 41 B.R. at 1015. Finally, Vogt did not prove that any payments were made within 45 days after the corresponding debt was incurred. The defendant having failed to meet her burden of proof, *id.* at 1014, the trustee is entitled to recover preferences of $493,414.44.

▮▮ The remaining allegations of preferences concern payments to Menicucci Insurance Services, Inc., and Bruno and Anna Menicucci personally. The following transactions occurred between the debtors and these defendants:

| Note No. | Date Invested | Amount Invested | Amount Repaid | Date Repaid |
|---|---|---|---|---|
| Menicucci: | | | | |
| 2200 | 1/29/82 | $10,000.00 | $10,398.74 | 4/29/82 |
| Menicucci Insurance Services: | | | | |
| 2189 | 1/22/82 | $32,000.00 | $32,164.40 | 2/05/82 |
| 2308 | 3/22/82 | $50,000.00 | $10,205.44 | 4/02/82 |
| 2331 | — | $40,000.00 | $10,438.40 | 5/04/82 |
| 2391 | — | $30,000.00 | $10,236.21 | 5/27/82 |

The analysis of the trustee's *prima facie* case against the Menicuccis is similar to that for Clair Vogt. The major difference is that the Menicuccis purchased notes, as the public investors did, rather than making "advances" as was Clair Vogt's practice. As holders of promissory notes, the Menicuccis were certainly creditors, and payment pursuant to the notes was on account of an antecedent debt. *See Independent Clearing House*, 41 B.R. at 1010–1011. With the exception of the first payment of $32,164.40 to Menicucci Insurance, all transfers were made within 90 days of the bankruptcy filing.

The Court need not address the issue whether the Insurance company should be considered an insider with reasonable cause to believe the debtors were insolvent, for the only payment to that defendant between 90 days and one year of the filing is subject to the § 547(c)(4) exception: On March 22, 1982, Menicucci Insurance gave new value in the form of an additional $50,000 investment, thus cancelling the preferential effect of the $32,164.40 payment on February 5, 1982. The remaining transfers to the Insurance company totalling $30,880.05, and the $10,398.74 transfer to the Menicuccis are not subject to any exception.

The (c)(1) defense does not apply, for, like the payments to Clair Vogt, the transfers to the Menicucci defendants were intended to discharge or reduce a prior debt—in the Menicuccis' case, the debts were obligations evidenced by the promissory notes. Therefore, the transfers were not intended to be, nor were they in fact, contemporaneous exchanges for new value.

As for the (c)(2) exception, the Menicucci defendants did not prove that they were in the business of lending or investing money. Subsection (c)(2)(A) is clear that the transfer, to be excepted from avoidance, must be in payment of a debt incurred in the ordinary course of business of *both* the debtor and the transferee. The defendants argue that this reading is too narrow as only professional lenders or investors would meet its requirements. However,

the exceptions must be construed in light of the purposes of the trustee's avoiding powers. The primary objective of the preference section is to promote equality of distribution. *See R & T Roofing, supra*, at 914. An exception is made in (c)(2) only for normal trade transactions, because protecting those transfers may encourage cooperation between the debtor and his creditors, thereby possibly preventing the troubled debtor's slide into bankruptcy. However, "it does not detract from the general policy of the preference section to discourage *unusual* action by either the debtor or his creditors." *Fulghum*, 45 B.R. at 116, quoting S.R. 989, 95th Cong.2d Sess. 88 (1978), *reprinted in* U.S.Code Cong. & Admin. News 1978, pp. 5787, 5874 (emphasis added). Given the hopeless financial condition of the debtors, especially during the last 90 days before the filings, no professional investor or lender would have risked its funds in these companies; only the naive would do so. This pyramid-type financial arrangement was "unusual and extraordinary", and should be discouraged, rather than protected. In addition, the Menicuccis were repaid with the funds of innocent people who made "investments" on the eve of the bankruptcy filings. Therefore, it would be unfair, and not within the intent of Congress, for the Menicuccis to be protected over the rest. *See Independent Clearing House*, 41 B.R. at 1014–1015.

Finally, with respect to the payment on Note 2200, the defendants did not prove that the transfer was made within 45 days after the debt was incurred. The debtors, either WWF or USSL, became bound to pay both principal and a fixed rate of interest on the date the note was executed. The defendants cannot rely on *Iowa Premium Service Co., Inc. v. First National Bank (In re Iowa Premium Service Co.)*, 695 F.2d 1109 (8th Cir.1982) for the proposition that an obligation to pay interest is incurred when the interest accrues. That court stressed the importance of the "contingent nature of the debt at issue" in reaching its decision. *Id.* at 1111. However, the debt to the Menicuccis was not contingent upon the length of time the

debtors retained use of the funds. Neither did the defendants present evidence that their actual agreement with the debtors included a provision for prepayment or payment on demand. Therefore, since the debtors' obligation was fixed and reduced to a sum certain upon execution, the debt was incurred on that day—January 29, 1982—and paid more than 45 days later, on April 29. *See also Wickham v. United America Bank (In re Property Leasing & Management, Inc.),* 46 B.R. 903, 913–914 (Bankr.E.D.Tenn.1985) (criticizing the *Iowa Premium* rationale).

## V. REMEDIES

In connection with the preference causes of action, the trustee has requested that the Court determine the status of the potential claims which may be filed by Vogt and the Menicuccis, as well as the claim already filed by Menicucci Insurance. It is the trustee's contention that these claims ought to be subordinated pursuant to 11 U.S.C. § 510(c).

It is well established that a bankruptcy court has the power to subordinate claims on equitable grounds. *Machinery Rental, Inc. v. Herpel (Matter of Multiphonics),* 622 F.2d 709, 713 (5th Cir. 1980). *See also Pepper v. Litton,* 308 U.S. at 306, 60 S.Ct. at 245. Subordination is proper when (1) The claimant has engaged in some type of inequitable conduct; (2) The misconduct has resulted in injury to creditors or conferred an unfair advantage on the claimant; (3) Equitable subordination is not inconsistent with the provisions of the Bankruptcy Code. *See Multiphonics, supra,* at 713. The inequitable conduct need not be related to the acquisition or assertion of the claim, *id.,* nor must actual fraud be shown, *id.* at 720, citing *Heiser v. Woodruff,* 327 U.S. 726, 732–733, 66 S.Ct. 853, 855–856, 90 L.Ed. 970 (1946). *See also Costello v. Fazio,* 256 F.2d 903, 910 (9th Cir.1958). The conduct of fiduciaries, especially corporate officers, directors, and stockholders, is subject to special scrutiny. *Id.; Pepper v. Litton, supra,* 308 U.S. at 306–308, 60 S.Ct. at 245–246.

The undercapitalization of these corporations was severe enough to warrant subordination of any and all claims which might be filed by these defendants. As the *Multiphonics* court explained, the failure to capitalize adequately itself constitutes misconduct which

tips the equities toward subordination. Under the "Deep Rock" doctrine, a stockholder's loans to his company will be treated as capital contributions when under the equities a company is deemed undercapitalized. *Pepper v. Litton, supra; Taylor v. Standard Gas Co.,* 306 U.S. 307 [59 S.Ct. 543, 83 L.Ed. 669] ... (1939).

*Id.* at 717. As in the *Multiphonics* case, the debtors here were "seriously underfinanced from [their] inception and grew financially weaker throughout [their] existence." *Id.* at 718. Clair Vogt advanced funds, as well as lent her credit to the corporations, precisely because they could not obtain credit on their own: They "could not have borrowed a similar amount of money from an informed outside source on the strength of [their] assets alone". *Id.* at 719. Although the Menicuccis were not stockholders, they were directors as well as the principal officers of WWF, and therefore had as much responsibility as any controlling shareholder for the financial conditions of Western World Funding. Finally, the Menicuccis have conceded that Menicucci Insurance Company is wholly owned and controlled by them; therefore, the acts of the Menicuccis individually should be imputed to the corporation.

More than "mere undercapitalization" has been shown here. *Compare Wood v. Richmond (In re Branding Iron Steak House),* 536 F.2d 299 (9th Cir.1976) *with Costello v. Fazio, supra,* at 910. As already discussed, the manner in which these debtors were operated created a pyramid-type arrangement, similar to the "Ponzi" scheme discussed in *Independent Clearing House, supra.* This operated as a constructive, if not an actual, fraud upon creditors. The conversion of corporate assets, and the mismanagement and neglect of the

corporations further injured creditors. *See Taylor v. Standard Gas, supra* (subordination appropriate where there is fraud and mismanagement in addition to undercapitalization). As several courts have explained in supporting subordination,

> Rather than invest ... capital the officers and stockholders, by the use of borrowed funds, substantially shifted and evaded the ordinary financial risks connected with this type of business enterprise and, at the same time, permitted the corporation[s] to remain in a constant state of or in imminent danger of insolvency.

*Multiphonics, supra,* at 721, quoting *Braddy v. Randolph,* 352 F.2d 80, 82 (4th Cir.1965). The Court has no difficulty in finding that it would be inequitable for these defendants to share equally with other creditors. Their claims will therefore be subordinated to those of general unsecured creditors.

■ The only issues remaining concern what is the appropriate type of recovery for the defalcations described in this Memorandum. The trustee has sought a constructive trust or equitable lien on the corporate assets misappropriated by the various defendants; however, he has been unable to trace those assets, except for a gift shop purchased by Neil Buchanan with $10,504 of the debtors' funds. Tracing is an essential element for the imposition of a constructive trust. *Alsco-Harvard Fraud Litigation,* 523 F.Supp. 790, 806–807 (D.D.C.1981); *Independent Clearing House,* 41 B.R. 1000–1001. It is insufficient to show that the wrongfully acquired property went into the general assets of the alleged "trustee". *Id.* at 1001. Therefore, the trustee may have a constructive trust only upon the gift shop.

■ In objecting to the propriety of the Court's imposing a constructive trust, the defendants argue that

> the mere failure to perform an agreement or to carry out a promise, or the failure to pay a debt, cannot give rise to a constructive trust, since such breach

does not in itself constitute fraud or the abuse of a confidence or duty ...

*Defendants Clair Vogt and Neil Buchanan's Post Trial Brief* at 30, quoting 76 Am.Jur.2d *Trusts* § 224. However, the diversion of corporate funds to Buchanan's own benefit is not a mere breach of contract, but a breach of fiduciary duty to the corporation and a constructive fraud upon it. Hence, this is an appropriate circumstance for the imposition of a constructive trust. *See Unicure, Inc. v. Thurman,* 42 Colo.App. 241, 599 P.2d 925, 927 (1979). *See also Schmidt v. Merriweather,* 82 Nev. 372, 418 P.2d 991 (1966) (constructive trust is appropriate where there is breach of a confidential relationship).

The remaining injury to the corporations and their creditors can be compensated only by the award of money damages. The trustee may recover the preferences as discussed herein. Vogt and Buchanan are jointly and severally liable for the damage to the corporations for their mismanagement and conversions. They are each liable for their fraudulent conveyances in the amounts discussed herein, as an alternative to the recovery for funds converted during the last year preceding the bankruptcy filing. The total award for these breaches of duty is approximately $5.6 million. Of this, the Menicuccis are jointly and severally liable with Vogt and Buchanan for approximately $3 million. Finally, pursuant to the Court's alter ego and partnership findings, Vogt and Buchanan will be liable to the trustee for any deficiency in the debtors' estate to pay in full all claims filed and allowed.

Judgment shall be entered accordingly.

### JUDGMENT

This cause having been considered by this Court upon the pleadings and evidence presented in trial, and upon briefs by counsel for the parties, and upon the findings of fact and conclusions of law set forth in the Memorandum Decision filed contemporaneously herewith,.

IT IS ORDERED, ADJUDGED, AND DECREED:

1. That Judgment be and is hereby entered in favor of Plaintiff and against Defendant Clair Vogt, on Plaintiff's claim for recovery of preferential transfers, pursuant to 11 U.S.C. § 547, in the amount of Four Hundred Ninety-Three Thousand, Four Hundred Fourteen and 44/100 Dollars ($493,414.44).

2. That Judgment be and is hereby entered in favor of Plaintiff and against Defendants Bruno and Anna Menicucci, on Plaintiff's claim for recovery of preferential transfers, pursuant to 11 U.S.C. § 547, in the amount of Ten Thousand, Three Hundred Ninety-Eight and 74/100 Dollars ($10,398.74).

3. That Judgment be and is hereby entered in favor of the Plaintiff and against Defendant Menicucci Insurance Services, Inc., on Plaintiff's claim for recovery of preferential transfers, pursuant to 11 U.S.C. § 547, in the amount of Thirty Thousand, Eight Hundred Eighty and 05/100 Dollars ($30,880.05).

4. That Judgment be and is hereby entered in favor of the Plaintiff and against Defendant Neil Buchanan, on Plaintiff's claims for fraudulent transfers, pursuant to 11 U.S.C. § 548 in the amount of Forty-Two Thousand, Seven and 48/100 Dollars ($42,007.48).

5. That Judgment be and is hereby entered in favor of the Plaintiff and against Defendant Neil Buchanan, on Plaintiff's claim for recovery of funds converted in the amount of One Hundred Twenty-Four Thousand, Six Hundred One and 78/100 Dollars ($124,601.78). This amount includes the amount fraudulently transferred by Defendant Neil Buchanan, as discussed above in paragraph 4.

6. That Judgment be and is hereby entered in favor of the Plaintiff and against Defendant Clair Vogt on Plaintiff's claim for the recovery of fraudulent transfers, pursuant to 11 U.S.C. § 548 in the amount of Two Hundred Sixty-Three Thousand, One Hundred Forty-One and 65/100 Dollars ($263,141.65). Judgment is also hereby entered in favor of Plaintiff and against Defendant Clair Vogt for the same amount on Plaintiff's claim for the recovery of sums converted from the debtor corporations. Although Judgments are hereby entered for this amount on the claims for both fraudulent transfers and conversions, Plaintiff may recover this amount only once.

7. That Judgment be and is hereby entered in favor of the Plaintiff and against Defendants Neil Buchanan, Clair Vogt, and Bruno and Anna Menicucci, on Plaintiff's claims of breach of fiduciary duty as follows:

a. Defendants Neil Buchanan and Clair Vogt shall be and hereby are jointly and severally liable to the Plaintiff in the amount of Five Million, Six Hundred Fifty-Six Thousand, Four Hundred Sixty-Eight Dollars ($5,656,468.00) representing the net loss for the debtor companies, all as discussed in the Memorandum Decision (this amount includes the amounts fraudulently transferred and converted by Defendants Clair Vogt and Neil Buchanan, as discussed above and as discussed in the Memorandum Decision).

b. Of the $5,656,468.00 amount, Defendants Bruno and Anna Menicucci are also jointly and severally liable, with Clair Vogt and Neil Buchanan, for Two Million, Nine Hundred Ninety-Six Thousand, Seven Hundred Ninety-Nine Dollars ($2,996,799.00).

8. That Judgment be and is hereby entered in favor of Plaintiff and against Defendants Neil Buchanan and Clair Vogt on Plaintiff's claims for partnership and alter ego liability, for any and all deficiencies in the estate to pay in full all allowed claims, including administrative claims, against the estate.

9. That Judgment be and is hereby denied Plaintiff, and entered in favor of Defendants Bruno and Anna Menicucci, on Plaintiff's claims for partnership and alter ego liability.

10. That Judgment be and is hereby entered in favor of Plaintiff and against Defendant Menicucci Insurance Services, Inc. on Plaintiff's claim that said Defendant's claims be equitably subordinated, pursuant to 11 U.S.C. § 510(c). Menicucci Insurance Services, Inc.'s presently-filed claim in the above-captioned consolidated estate is hereby subordinated to all other allowed claims in the estate. Also, if and when Menicucci Insurance Services, Inc. satisfies the above-stated Judgment for preferential transfers received, the claim which would arise from the payment of said Judgment is also hereby subordinated to all other allowed claims in the consolidated estate.

11. That Judgment be and is hereby entered in favor of Plaintiff and against Defendants Bruno and Anna Menicucci on Plaintiff's claim for equitable subordination, pursuant to 11 U.S.C. § 510(c). If and when Bruno and Anna Menicucci satisfy the above-said Judgment for preferential transfers received, then any claim that would arise from the payment of said judgment is hereby subordinated to all other allowed claims in the consolidated estate.

12. That Judgment be and is hereby entered in favor of Plaintiff and against Defendant Clair Vogt on Plaintiff's claim for equitable subordination, pursuant to 11 U.S.C. § 510(c). If and when Defendant Clair Vogt satisfies the above-said Judgment for preferential transfers received, then any claim that would arise out of said payment is hereby subordinated to all other allowed claims in the consolidated estate.

13. That Judgment be and is hereby entered in favor of Plaintiff and against Defendants Neil Buchanan, Clair Vogt, Bruno and Anna Menicucci, and Menicucci Insurance Services, Inc., for attorneys' fees, accountants' fees, and costs. Costs shall be taxed by the Clerk of the Court. Plaintiff shall file Affidavits with the Court, giving proper Notice thereof to Defendants, respecting the Judgment for attorneys' and accountants' fees.